No. 85,228

STATE OF KANSAS, *Appellee*, v. CHARLES JONES, *Appellant*.

(47 P.3d 783)

Opinion filed May 31, 2002.

*Randall L. Hodgkinson*, deputy appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the briefs for appellant.

*Charles Jones*, appellant, was on a separate brief pro se.

*Terra D. Morehead*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Charles Jones, age 16, was certified to stand trial as an adult on the charge of first-degree murder for the July 21, 1998, shooting death of Robert Trzok. The victim was shot three times

in the back of the head, causing his immediate death. On appeal, Jones alleged he was denied due process based upon lack of notice to his parents, in violation of K.S.A. 38-1636(a), and improper procedures of the court in certifying him to stand trial as an adult. He further alleged that the presumption under K.S.A. 38-1636(a)(2) that he is an adult violated his due process rights under the United States Constitution. Finally he contends that other trial errors, including violations of his rights under the Sixth and Fourteenth Amendments to the United States Constitution as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), require reversal of his conviction. Finding no reversible error, we affirm.

Facts

The State's theory at trial was that Jones had been robbed and injured by Trzok prior to the shooting. After identifying Trzok's parked car, Jones and his friend LaKevis Tensley entered the house where Trzok and four others, Jeffrey Fields, Ronald Haskins, S.W., and E.G., were drinking and consuming drugs. Jones and Tensley beat Trzok and drug him out of the house and onto the front porch where Jones shot Trzok three times in the back of the head.

### Motive Evidence

Tracy Thomas, an emergency room nurse, testified that days prior to the shooting death of Trzok, she treated a male who identified himself as Santos Metcalf, for a serious mouth laceration. The person purporting to be Santos Metcalf explained he was hurt by riding his bicycle into a clothes line. A doctor sutured the person's mouth and sent him home. Sandra Metcalf, Jones' cousin, testified that Santos Metcalf is her brother and that he had never had a laceration to his mouth. She testified it actually was Jones who had suffered the injury to his mouth.

### LaKevis Tensley

Tensley testified regarding the events of July 21, 1998. Tensley was driving when he saw Jones walking and picked up Jones. They continued to ride around getting high by smoking marijuana. Tensley observed injuries to Jones mouth, which Tensley believed oc-

curred while someone tried to rob Jones. Jones spotted the car belonging to the man who robbed him. Tensley testified he believed Jones merely wanted to beat the guy who had robbed him. Tensley and Jones carried guns as they walked to the house.

Jones entered the house first. By the time Tensley entered the house, Jones was already talking to Trzok. Both Tensley and Jones were wearing bandannas to conceal their identity. Jones asked Trzok to come outside and when Trzok refused, Tensley struck Trzok in the face and kicked Trzok before dragging Trzok out of the house. According to Tensley, when he reached the outside of the house he began running to his car. It was not until Tensley was running to his car that he heard shots. Tensley and Jones left in Tensley's car. Tensley dropped Jones off at his grandmother's house.

### *Jeffrey Fields*

Fields testified that he had known Trzok for a few months before Trzok's murder. On the day of the murder, Trzok drove his own car to Fields' house, arriving at 9 a.m. Fields and Trzok began smoking crack cocaine at that time. E.G., S.W., and Haskins all arrived later. Those at the house drank alcohol and consumed crack cocaine and marijuana. According to Fields, Trzok purchased most of the crack, spending between $700 to $1,000.

Late in the evening, Haskins unlocked the front door and permitted two people to enter. Fields testified Jones entered first, and then a second person entered sometime thereafter. Fields testified he did not recognize Jones at first as one of the intruders, but said he had recognized him as someone whom he had seen previously in the neighborhood. Fields said Jones and Tensley wore bandannas over their faces. Trzok did not want to go outside with Jones and Tensley. Fields told Trzok to get up and go outside to take care of his business with Jones and Tensley because Fields did not "like confusion inside [his] home." Fields confirmed there was a struggle to get Trzok outside. Fields noticed Jones had a gun which looked like a revolver. When Jones and Tensley dragged Trzok out of the house, Fields shut and locked the door. Fields observed Jones bend down to shoot Trzok.

Later, during an interview at the police department, Fields identified Jones from a lineup as the man who shot Trzok. Fields denied that he, Haskins, S.W., or E.G. had anything to do with Trzok's murder.

### Ronald J. Haskins, Sr.

Haskins, who is Fields' uncle, arrived at Fields' house around noon the day of Trzok's murder. Haskins confirmed that he drank alcohol and got high while at Fields' house. According to Haskins, he heard a knock, saw Jones outside, and yelled out to Fields to announce Jones' presence. Fields authorized Haskins to unlock the door for Jones. Haskins identified Jones as the person standing on the porch. Although Jones put on a bandanna when he entered the house, Jones was not wearing the bandanna when Haskins saw him standing outside the house.

Haskins testified that Jones entered the house and told Trzok to leave the house. Haskins confirmed that a second man then entered the house and both Tensley and Jones beat Trzok and drug him outside. After Jones and Tensley dragged Trzok outside, Haskins heard gunshots. Haskins also picked Jones out of a photo lineup.

### S.W. and E.G.

S.W.'s testimony was consistent with Fields and Haskins regarding the events on the evening of the murder, but S.W. could not identify either of the intruders. E.G. also testified at trial. E.G.'s testimony confirmed the events leading up Trzok's murder. E.G. identified Jones as the first of the two intruders.

### Investigation of Scene

Dr. Erik Mitchell, a forensic pathologist, performed the autopsy identifying three gunshot wounds to the back of Trzok's head. Trzok had cocaine, but no alcohol, in his blood at the time of his death. Dr. Mitchell also identified numerous other injuries to Trzok's shoulder, left arm, back of right hand, back of right elbow, and left lower back. The cause of death was the gunshots wounds to the head.

Don Garrett, a police officer, testified that he recovered three bullets from the scene: two were under Trzok's head and another lodged in the house next door. Dr. Mitchell removed a fourth bullet from Trzok's body.

William Newhouse, the chief criminalist with the firearms and toolmark section with the police department, analyzed the bullets from the scene. Newhouse testified the bullets were fired from the same gun, which had to be a .38/.357 caliber weapon.

Sophia Barajas, a police officer, testified she was immediately dispatched to the scene after shots were reported. Officer Barajas testified the red car parked in front of Fields' house belonged to Trzok.

### Jones' Flight to Iowa

Jones' cousin Metcalf testified that Jones stayed with her on Wednesday night, which was the night after the murder. On Thursday evening, Metcalf and her boyfriend drove Jones to Des Moines, arriving early Friday morning. Metcalf and her boyfriend dropped Jones off at his mother's apartment.

Greg Trimble, an officer with the Des Moines police department, testified that he was called on Friday to help the Federal Bureau of Investigation in finding Jones. Officer Trimble arrested Jones. According to Officer Trimble, Jones continually questioned Officer Trimble about the purpose for the arrest. Upon learning of the allegations, Jones denied being responsible for any murder; however, his denial assumed that the murder was committed with a gun, a fact that had not been revealed to Jones.

Jan Bjurstrom, an officer with the Des Moines police department, testified that she noticed blood on Jones' shoe. Jones explained it was blood from his mouth injury. Officer Bjurstrom seized the shoes and gave them to Kansas detectives who had come to Des Moines to interview Jones.

### DNA Evidence

Linda Netzel, a senior criminalist with the Kansas City, Missouri, police department, testified about the DNA analysis of blood extracted from Jones' shoe. Netzel testified the blood on Jones' shoe

matched Trzok's blood. Further, Netzel excluded Jones' own blood from possibly matching the stain. Netzel testified there was a 1 in 32 million chance of finding another person with DNA also matching the stain. Netzel also testified about a phenomenon in DNA analysis known as spillover, which could potentially render the test invalid. However, Netzel testified that spillover was not possible in her analysis.

### Jones' Case in Chief

Dr. Dean Stetler, a professor at the University of Kansas, testified regarding the DNA analysis and how it is not impervious to human error. Dr. Stetler identified a particular type of error, cross-contamination:

"As I described, you have the tubes there. You're transferring volume from this tube and then next to it you are transferring a volume from the next tube. If you forget to eject the pipette tip or get the numbers mixed up, then there is a possibility you have cross-contaminated or that you've mixed them up. And that happens in the preparation or the setup of the restriction gel and during the preparation and performance of the restriction enzyme digestion."

According to Dr. Stetler, the process used by the State risked such cross-contamination.

Dr. Stetler also testified about spillover:

"This is the final step in the analysis and there is always a possibility of a spillover. That is, one tries to put all the DNA in this little well. Because of the nature of the procedure, it's possible that some of that DNA will end up in an adjacent well.

. . . .

"Q. What's the effect on your results potentially even if that's a little-bitty spillover?
"A. Well, if you have a known sample with a lot of DNA in it right next to an evidence sample with no or very little DNA in it, then it appears that this evidence sample had DNA from this individual."

Spillover invalidates the results of DNA testing. Dr. Stetler testified spillover "might have occurred" in the DNA analysis of the State.

On cross-examination, the prosecutor pressed Dr. Stetler on the issue of whether spillover occurred:

"Q. The answer would be, Dr. Stetler, then that you cannot testify beyond a reasonable degree of scientific certainty that spillover has occurred in this case?

. . . .

"A. I can't be certain one way or the other."

## (1) Notice

Jones argues the trial court, in violation of the Due Process Clause of the United States Constitution, authorized the State to prosecute Jones as an adult without proper notice to his parents. K.S.A. 38-1636 governs the procedure for authorizing the prosecution of a juvenile under the adult criminal statutes. To begin the procedure, the State must file a motion with the court. K.S.A. 38-1636(a). K.S.A. 38-1636(c)(1) provides, in relevant part: "The court shall give notice of the hearing to the respondent, each parent of the respondent, if service is possible, and the attorney representing the respondent."

The State filed a motion to authorize the prosecution of Jones, age 16, as an adult. At the hearing on the State's motion, Jones' attorney objected to the authorization to prosecute as an adult because Jones' parents had not received notification of the hearing. Jones' attorney admitted that he had been given notice. Jones' attorney asked the court to wait until the parents could be given notice.

The State argued in response that it neither knew who Jones' parents were nor how to find them. In ruling on the State's motion to prosecute Jones as an adult, the court relied on the State's representation: "The information I have from the State is they were not aware of the addresses of the parents and did not know how to contact them." The court declined Jones' request to postpone ruling on the motion, and authorized the State to prosecute Jones as an adult. At the close of the hearing the court noted:

"Further additions to the record . . . . After the hearing, I spoke with both Ms. Meyer, of the District Attorney's Office, and Mr. DeGraff, court-appointed counsel; and Mr. DeGraff told me that at the time he made his argument regarding notification of the parents, he was not aware that the mother of Mr. Jones was, in fact, in the courtroom, that she apparently came a little bit later. There were numerous relatives in the courtroom whom he spoke to ahead of time. Therefore, as I stated earlier, clearly a parent did receive some type of notice of this hearing, and I believe the statute was complied with."

The State knew Jones' mother lived in Des Moines, as Jerry Fiscus, a retired detective with the police department, drove to Des Moines to interview Jones. Another detective telephoned Jones' mother to get permission to interview Jones as required by Iowa law. During Officer Bjurstrom's testimony, she said she went to "315 S. E. McKinley, Apartment 42," Jones' mother's apartment, to arrest Jones. Thus, the State knew how to contact Jones' mother. Its statement to the trial court about lack of knowledge as to the whereabouts of Jones' mother was untrue. The prosecutor failed to check with the arresting office. In this appeal, the State concedes this point.

The State emphasizes the language "if possible" in K.S.A. 38-1636(c)(1) to argue the statutory mandate is not as emphatic as it might be. The State also implies with a quotation from *State v. Muhammad*, 237 Kan. 850, 703 P.2d 835 (1985), that the interests at stake in a proceeding to authorize prosecution as an adult are not sufficiently critical that reversal is necessary if the parents do not have notice.

Jones cites *In re Gault*, 387 U.S. 1, 4, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), which reversed the Arizona Supreme Court's decision to affirm the dismissal of a habeas corpus action. Gault, a 15 year old, was adjudicated a juvenile delinquent and committed to a juvenile facility. The United States Supreme Court held that Gault was, in part, entitled to habeas corpus relief because the State of Arizona had failed to provide adequate notice of the charges against him. 387 U.S. at 31-34. The *Gault* Court described the type of notice required:

"Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must 'set forth the alleged misconduct with particularity.' It is obvious, as we have discussed above, that no purpose of shielding the child from the public stigma of knowledge of his having been taken into custody and scheduled for hearing is served by the procedure approved by the court below. *The 'initial hearing' in the present case was a hearing on the merits*. Notice at that time is not timely; and even if there were a conceivable purpose served by the deferral proposed by the court below, it would have to yield to the requirements that the child and his parents or guardian be notified, in writing, of the specific charge or factual allegations to be considered at the hearing, and that such written

notice be given at the earliest practicable time, and in any event sufficiently in advance of the hearing to permit preparation. Due process of law requires notice of the sort we have described—that is, notice which would be deemed constitutionally adequate in a civil or criminal proceeding. *It does not allow a hearing to be held in which a youth's freedom and his parents' right to his custody are at stake without giving them timely notice, in advance of the hearing, of the specific issues that they must meet.* Nor, in the circumstances of this case, can it reasonably be said that the requirement of notice was waived." (Emphasis added.) 387 U.S. at 33-34.

This court discussed a due process argument based on *Gault* in *Muhammad*. Muhammad was not able to attend the hearing on the State's motion to prosecute her as an adult because the State arrested her, mistaking Muhammad for her sister. Muhammad was represented by an attorney at the hearing. The court in *Muhammad* framed the issue as to whether the defendant had been "denied due process of law when the court waived its juvenile jurisdiction over her, pursuant to K.S.A. 1984 Supp. 38-1636(d), without her being present at the hearing." 237 Kan. at 851. This court discussed *Kent v. United States*, 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (1966), and *Gault*. After its discussion of the above cases, this court emphasized the civil nature of juvenile proceedings. 237 Kan. at 854. In its concluding paragraphs, this court rephrased the issue, emphasizing the fact that Muhammad was represented by counsel: "The critical question here is whether the court may conduct a hearing without a voluntary waiver of appearance by the juvenile *if counsel is present and allowed to participate on the juvenile's behalf.*" (Emphasis added.) 237 Kan. at 856. The *Muhammad* court stressed that while the hearing

"involves a substantial right subject to the requirements of due process, it is not adjudicatory in nature in that it does not result in any determination of guilt or innocence or in confinement or punishment. It is merely a preliminary process to determine the type of adjudicatory procedure to be carried out at a later date. The only decision is dispositional in that the court determines whether further proceedings will be under the juvenile offenders code or under the Kansas criminal code. As indicated earlier the statutes require that the juvenile must be represented and that the attorney be present for the hearing. Under such circumstances, the defendant was not denied due process of law.

"We hold that when the provisions of K.S.A. 1984 Supp. 38-1636 requiring a hearing, notice and the right of the juvenile to be present and participate in the

hearing are met, along with the statutory requirement of counsel, the 'essentials of due process and fair treatment' required by *Kent* are satisfied even though the juvenile fails to appear." 237 Kan. at 856.

The issue in this case is whether the defendant has been denied due process of law where the State has failed to comply with the provisions of K.S.A. 38-1636(c):

"(c)(1) Upon receiving a motion as established in subsection (a) [petition to prosecute as an adult], the court shall set a time and place for hearing on the motion. *The court shall give notice of the hearing to the respondent, each parent of the respondent, if service is possible, and the attorney representing the respondent.* The motion shall be heard and determined prior to any further proceedings on the complaint." (Emphasis added).

While statutory notice to the parents was not given in accordance with K.S.A. 38-1636(c)(1), and at least to this extent the provisions of K.S.A. 38-1636(c) were violated, we do not believe that the violation amounted to a denial of due process to the respondent. Jones was represented by counsel at both the detention hearing and at the hearing on the motion to prosecute him as an adult. Unlike *In re Gault* relied upon by Jones, the notice in this case did not deal with a failure to provide Jones, Jones' counsel, and Jones' parents with notice of the charges. Lack of notice of the charges strikes at the heart of due process for without such notice, preparation is impossible and the resulting hearing is meaningless. Jones' counsel agreed that both he and the respondent received adequate advance notice of the hearing and the purpose of the hearing. Jones was represented by counsel throughout the proceedings. Moreover, as this court noted in *Muhammad*, the hearing was not adjudicatory but dispositional. While a substantial right was involved, the hearing did not result in the determination of guilt or confinement. 237 Kan. at 856.

The trial court also noted in concluding the hearing that the notice provisions had been complied with based upon the mother's presence at the hearing. She received actual notice which served to satisfy the dictates of K.S.A. 38-1636(c)(1). Other than the notice provisions objection, Jones presented no evidence to rebut the presumption in K.S.A. 38-1636(a)(2). There was no suggestion the failure to serve Jones' mother with notice caused Jones any prej-

udice, *i.e.*, Jones does not argue his mother could have provided some evidence to rebut the presumption in K.S.A. 38-1636(a)(2) had she been served with notice.

*Muhammad* recognized that K.S.A. 38-1636 was based on the due process principles discussed in *Kent.* See *Muhammad,* 237 Kan. at 853 ("Our statute, based largely on *Kent,* provides numerous safeguards in the procedure for determination of whether a juvenile is to be prosecuted as an adult."). As the discussion of *Gault* in *Muhammad* shows, Jones was afforded the necessary protections of due process when he was present and represented by counsel at all critical stages of the proceedings. 237 Kan. at 853-54. Thus, the violation of K.S.A. 38-1636(c)(1) does not rise to the level of a violation of due process. To reverse the present case would not further the purpose of the statute as revealed in *Muhammad, i.e.,* guaranteeing juvenile defendants due process.

## (2) Trial court's consideration of K.S.A. 38-1636(e) factors.

Jones argues that the trial court failed to consider all the factors in K.S.A. 38-1636(e) when authorizing the State to prosecute him as an adult. K.S.A. 38-1636(e) provides:

"In determining whether or not prosecution as an adult should be authorized or designating the proceeding as an extended jurisdiction juvenile prosecution, the court shall consider each of the following factors: (1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult or designating the proceeding as an extended jurisdiction juvenile prosecution; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the offense was against a person or against property. Greater weight shall be given to offenses against persons, especially if personal injury resulted; (4) the number of alleged offenses unadjudicated and pending against the respondent; (5) the previous history of the respondent, including whether the respondent had been adjudicated a juvenile offender under this code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence; (6) the sophistication or maturity of the respondent as determined by consideration of the respondent's home, environment, emotional attitude, pattern of living or desire to be treated as an adult; (7) whether there are facilities or programs available to the court which are likely to rehabilitate the respondent prior to the expiration of the court's jurisdiction under this code; and (8) whether the interests of the respondent or of the community would be better served by criminal prosecution or extended jurisdiction juvenile prosecution. The insuffi-

ciency of evidence pertaining to any one or more of the factors listed in this subsection, in and of itself, shall not be determinative of the issue. Subject to the provisions of K.S.A. 38-1653, and amendments thereto, written reports and other materials relating to the respondent's mental, physical, educational and social history may be considered by the court."

This court's standard of review is set forth in *State v. Medrano*, 271 Kan. 504, 506-07, 23 P.3d 836 (2001):

"The standard for reviewing the decision to authorize prosecution as an adult is whether the decision is supported by substantial evidence. [Citations omitted.] Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can be reasonably be resolved. [Citation omitted.] It is not for this court to reweigh the evidence, substitute its evaluation of the evidence for that of the trial court, or pass upon the credibility of the witnesses. [Citation omitted.]"

The State disputes that K.S.A. 38-1636(e) requires the court to mention all the factors for consideration. Further, the State argues there was sufficient evidence to support the court's decision.

At the hearing on the State's motion to prosecute Jones as an adult, the court first required that Jones either admit or deny (1) that Jones was 16 years old at the time of the crime; and (2) that the State was charging Jones with an off-grid person felony. According to K.S.A. 38-1636(a)(2)(A), the above facts trigger a presumption that the defendant should be prosecuted as an adult with the burden of proof to rebut the presumption placed on the juvenile. Jones' attorney admitted to both of the facts. The court then announced the burden shifted to Jones to rebut the presumption. Jones presented no evidence in rebuttal and limited his response to the issue of notice discussed above.

In *Medrano*, we said:

"K.S.A. 38-1636(e) does not require the magistrate to mention the factors used in certifying a juvenile to be tried as an adult when rendering the decision. The court's standard for certifying applies to the evidence rather than to the analysis of the decision maker. [Citation omitted.]

. . . .

"K.S.A. 38-1636(e) sets forth the factors to be considered when determining whether to treat a defendant as an adult or a juvenile. These factors must be considered by the court even where there is a presumption that the defendant is an adult under 38-1636(a)(2)." 271 Kan. at 507.

See also *State v. Avalos*, 266 Kan. 517, 521, 974 P.2d 97 (1999) (K.S.A. 38-1636[e] does not require the magistrate to mention the factors.) But consideration of the eight factors is required when the K.S.A. 38-1636(a)(2) presumption applies. *Medrano*, 271 Kan at 507. Once the presumption applies the burden to rebutt rests on the defendant: "The presumption can be overcome." *State v. Coleman*, 271 Kan. 733, 738, 26 P.3d 613 (2001).

Jones presented no evidence regarding the eight factors in K.S.A. 38-1636(e). Factors 1, 2, 3, and 5 were established by substantial competent evidence based upon Jones' admissions to the trial court during the certification hearing and Jones' record of a prior juvenile adjudication. The execution style shooting was an aggressive, violent, premeditated, and willful act resulting in the death of Trzok. In the face of the statutory presumption that Jones should be tried as an adult, he presented no evidence in rebuttal regarding any of the remaining factors. K.S.A. 38-1636(e) specifically provides that "insufficiency of evidence pertaining to any one or more of the factors listed in this subsection, in and of itself, shall not be determinative of the issue." Implicit in the trial court's decision based upon the entire record together with the statutory presumption, the absence of any evidence rebutting the statutory presumption, and the trial court's consideration of K.S.A. 38-1636(e) in its final decision, we conclude that the decision to try Jones as an adult was supported by substantial evidence.

Jones relies on *State v. Smith*, 268 Kan. 222, 993 P.2d 1213 (1999), a case involving five defendants, wherein this court reversed a district court's authorization to prosecute Adam Gault, a juvenile codefendant, as an adult. 268 Kan. at 246. Gault was originally charged with misdemeanor theft and conspiracy to commit theft by deception. The most serious version of theft was a level 7, nonperson felony. See K.S.A. 2001 Supp. 21-3701(b). Thus, the presumption of adult status did not arise in *Smith*. The court noted the State's motion was conclusory and failed to directly address the factors in K.S.A. 38-1636(e), with no other evidence offered. 268 Kan. at 245.

*Smith* provides little, if any, support for Jones. Jones was charged with first-degree murder, while Smith was charged with theft by

deception. There was no burden for Smith to rebut any evidence presented by the State. However, the statutory presumption in K.S.A. 38-1636(a)(2) applied in Jones' case and placed a burden to rebut on Jones.

### (3) K.S.A. 38-1636(a)(2) Presumption

Jones argues that the presumption in K.S.A. 38-1636(a)(2) that certain juvenile offenders are presumed to be adults violated his due process rights. In *Coleman*, this court held "[t]he presumption in K.S.A. 38-1636(a)(2) does not violate procedural due process rights." 271 Kan. at 738. Appellate defense counsel did not have the benefit of the *Coleman* decision at the time his brief was submitted. However, *Coleman* was decided before oral argument and counsel acknowledged that *Coleman* applied. *Coleman* is dispositive of this issue.

### (4) *Apprendi v. New Jersey*

Jones argues that because the trial court's decision to authorize adult prosecution pursuant to K.S.A. 38-1636 substantially increased the penalty for the offense, the principles cited in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), render that decision a violation of the Sixth and Fourteenth Amendments to the United States Constitution. This issue raised is one of law, and our standard of review is unlimited. *State v. Sanders*, 272 Kan. 445, 461, 33 P.3d 596 (2001).

Jones' argument may be summarized as follows: *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Jones reasons that Kansas law runs afoul of *Apprendi* because the fact that he should be tried as an adult is made by a judge resulting in a penalty beyond the statutory maximum.

In our consideration of this issue, we must determine whether a decision under K.S.A. 38-1636 to authorize adult prosecution of a juvenile increases the penalty for a crime beyond the prescribed statutory maximum. Implicit in Jones' argument is that the statu-

tory maximum is the one under the juvenile system, not the Kansas criminal code. Sentencing under the Kansas criminal code does not exceed the prescribed statutory maximum.

K.S.A. 38-1636

K.S.A. 38-1636 provides the procedure for authorizing adult prosecution of a juvenile, which in this case involves the analysis of a presumption and rebuttal of that presumption. According to the statute, there are two types of cases: (1) cases where the juvenile is presumed to be a juvenile and the burden of proof is on the State to prove "good cause" to prosecute the juvenile as an adult, K.S.A. 38-1636(a)(1); and (2) cases where the juvenile is presumed to be an adult and the burden of proof is on the juvenile to rebut the presumption, K.S.A. 38-1636(a)(2). The first type of case is not at issue here. Under the second type of case, the adult presumption arises in two circumstances: (1) where the juvenile is of a certain older age and is charged with certain serious offenses; or (2) where the juvenile has a certain criminal history. K.S.A. 38-1636(a)(2). Only the first of these alternatives is at issue in this present case. Thus, for the presumption at issue to arise, as it did in this case, the court must make the following findings: (1) the age of the juvenile; and (2) the type of crime charged.

K.S.A. 38-1636(e), as quoted above, sets forth a list of factors to be considered by the court in deciding whether a juvenile is to be tried as an adult. These factors require a mixed analysis of (a) the details of the allegations against the juvenile, as well as (b) the juvenile's amenability to treatment under the juvenile system. Factors 1 through 5 require the court to consider the juvenile and what he or she has done in the past, including the State's allegations giving rise to the present case. Factor 6 requires the court to evaluate the "sophistication or maturity" of the juvenile and to consider the juvenile's "home, environment, emotional attitude, pattern of living or desire to be treated as an adult." Factor 7 requires the court to determine whether the resources available in the juvenile system can rehabilitate the juvenile. Factor 8 requires the court to determine whether the interests of the community and the juvenile would be better served by an adult prosecution.

K.S.A. 38-1636(f)(1) permits the court to authorize the adult prosecution of a juvenile if the court finds "substantial evidence that the respondent should be prosecuted as an adult," in which case the adult criminal procedure becomes applicable and the juvenile case is dismissed.

### Apprendi

The Court in *Apprendi* considered a New Jersey law punishing the "possession of a firearm for an unlawful purpose." 530 U.S. at 468. If convicted of this crime, the New Jersey law also provided for an increased sentence if the trial judge found that the crime was committed with the purpose of intimidating certain people, known as a hate crime law. The Court framed the issue as whether due process required the factual determination authorizing the increased sentence to be made by a jury beyond a reasonable doubt. The Court answered the question in the affirmative. 530 U.S. at 490.

In *Apprendi*, the State defended its statute by pointing out how the required finding of "biased purpose is not an 'element' of a distinct hate crime offense, but rather the traditional 'sentencing factor' of motive." 530 U.S. at 492. The Court rejected the argument, finding that "the relevant inquiry is one not of form, but of effect." 530 U.S. at 494; see *State v. Gould*, 271 Kan. 394, 410, 23 P.3d 801 (2001) ("Under *Apprendi*, it does not matter how the required finding is labeled, but whether it exposes the defendant to a greater punishment than that authorized by the jury's verdict.").

### Kansas Cases

This court in *State v. Hitt*, 273 Kan. 224, Syl. ¶¶ 1 and 2, 42 P.3d 732 (2002), rejected an argument that *Apprendi* required "the fact of a prior juvenile adjudication . . . be charged in the indictment and proven to a jury beyond a reasonable doubt before it can be included in a defendant's criminal history score." The *Hitt* court examined the reasoning behind the *Apprendi* Court's exception of "prior conviction" from its rule. Having established that the rationale for the exception for prior convictions relies in part on

the procedures satisfying fair notice, reasonable doubt, and jury-trial guarantees, the *Hitt* court proceeded to face the fact that a juvenile adjudication contained fewer safeguards than an adult conviction. The *Hitt* court discussed the split a similar issue caused the Ninth Circuit Court of Appeals in *U.S. v. Tighe*, 266 F.3d 1187 (9th Cir. 2001). The *Hitt* court discussed the Juvenile Justice Code, pointing out that special treatment is not constitutionally required, but is rather created by statute. The court also pointed out how certain rights afforded a defendant under the adult system are not constitutionally required for a respondent under the juvenile system, as stated in *State v. LaMunyon*, 259 Kan. 54, 911 P.2d 151 (1996).

In its analysis, the *Hitt* court noted the disruption the defendant's interpretation of *Apprendi* would cause. The court noted that in *Gould*, the *Apprendi* rule clearly applied, but the same could not be said in Hitt's case. Before causing such a disruption in the Kansas juvenile system, this court would require a clear mandate from the United States Supreme Court. 273 Kan. at 235. This court reasoned that (1) *Apprendi* relied only on general "procedural safeguards"—not "all procedural safeguards afforded adults," and (2) the procedural safeguards under the juvenile system were sufficient to come under *Apprendi's* rationale for the exception of prior convictions. 273 Kan. at 235-36.

K.S.A. 38-1636(c)(2) provides that at the hearing to determine whether a juvenile will be tried as an adult, the court shall inform the respondent of the following:

"(A) The nature of the charges in the complaint;

"(B) the right of the respondent to be presumed innocent of each charge;

"(C) the right to trial without unnecessary delay and to confront and cross-examine witnesses appearing in support of the allegations of the complaint;

"(D) the right to subpoena witnesses;

"(E) the right of the respondent to testify or to decline to testify; and

"(F) the sentencing alternatives the court may select as the result of the juvenile being prosecuted under an extended jurisdiction juvenile prosecution."

In addition, the respondent is entitled as a matter of right to be represented by counsel at all stages of proceedings. However, the determination of whether to try the juvenile as an adult is not a

jury determination and ultimately is determined on the basis of whether there is substantial competent evidence to support a final determination that the juvenile be tried as an adult. Kansas law, from its inception to date, has treated juveniles under a comprehensive system which has been modified by statute and case law, such as the decision in *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967). However, the decisions of the United States Supreme Court, as well as of this court and of courts throughout the remainder of states, have always treated juveniles different than they would be treated under adult criminal systems. The procedural safeguards are deemed adequate to withstand the demands for jury determinations within the juvenile system, as well as to support other differences afforded in the adult system but not in the juvenile system.

The determination that a jury is not required in the juvenile system has been considered by the United States Supreme Court. In *McKeiver v. Pennsylvania*, 403 U.S. 528, 545-51, 29 L. Ed. 2d 647, 91 S. Ct. 1976 (1971), the Court in a plurality decision described 13 reasons why a jury trial is not necessary at the "adjudicative stage" in a juvenile proceeding. Among the stated reasons are (1) preventing the juvenile proceedings from becoming a "fully adversary process," thereby putting "an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding," 403 U.S. at 545; (2) requiring a jury trial would "bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial," 403 U.S. at 550; and (3) equating the juvenile system to the adult system—as is necessary to argue the juvenile is entitled to the same rights as the adult—would "ignore . . . every aspect of fairness, of concern, of sympathy, and of paternal attention that the juvenile court system contemplates." 403 U.S. at 550.

We conclude that the above reasons, as well as the other procedural safeguards provided for in K.S.A. 38-1636, are sufficient and support a determination that certification proceedings under our statutory scheme for the care and treatment of juveniles fall outside the dictates of *Apprendi*.

The Kansas Court of Appeals has considered and rejected the precise argument raised by Jones. *State v. Hartpence*, 30 Kan. App. 2d 486, Syl. ¶ 4, 42 P.3d 1197 (2002). The *Hartpence* court classified *Apprendi* as dealing with the sentencing phase of a prosecution, while the K.S.A. 38-1636 procedure is a jurisdictional matter where the decision is made which court will resolve the case. 30 Kan. App. 2d at 496.

### *Other Jurisdictions*

The New Mexico Court of Appeals in *State v. Gonzales*, 130 N.M. 341, 24 P.3d 776 (Ct. App. 2001), held that its system of permitting juvenile courts to sentence offenders as adults if the court finds by a preponderance of the evidence that the offender is either (1) not amenable to treatment as a child or (2) ineligible for commitment in an institution, did not violate the rule in *Apprendi*. 130 N.M. at 350. The court distinguished its system of determining that a child is not amenable to treatment within the juvenile system from the traditional findings of criminal liability in three ways:

"First, while findings of guilt are measures of the degree of an individual's criminal culpability, the finding that a child is or is not amenable to treatment is a measure of a child's prospects for rehabilitation. Second, while findings of guilt are based on historical facts susceptible of proof beyond a reasonable doubt, a finding that a child is not amenable to rehabilitation requires a prediction of future conduct based on complex considerations of the child, the child's crime, and the child's history and environment. Third, a determination of amenability or eligibility for commitment requires some foreknowledge of available facilities and the programs in them that trial judges who make sentencing decisions every day have, while juries do not." 130 N.M. at 348-49.

The Appellate Court of Illinois rejected an argument similar to Jones' in *People v. Beltran*, 327 Ill. App. 3d 685, 765 N.E.2d 1071 (2002):

"Superficially, defendant appears to proffer a valid application of *Apprendi*. Nevertheless, his argument fails because he attempts to divorce the case's holding from its legal basis. New Jersey's 'hate crime' law violated due process because, as the accused in a criminal prosecution, the defendant had the right to have a jury determine, beyond a reasonable doubt, the facts that established the maximum penalty. A hearing under section 5-805(2) [adult prosecution], however, is a juvenile proceeding. Thus, whether defendant was denied due process depends

on the standards applicable to those proceedings, rather than those applicable to criminal prosecutions. [Citation omitted.]

"It is well established that, in a juvenile proceeding, due process does not require a jury. [Citations omitted.] As for the standard of proof, due process requires proof beyond a reasonable doubt during the adjudicatory stage of a juvenile proceeding . . . . However, that standard does not apply to the dispositional stage of a juvenile proceeding. [Citation omitted.]

"A hearing under section 5-805(2) is dispositional, not adjudicatory. That is, the hearing determines not the minor's guilt but the forum in which his guilt may be adjudicated. [Citation omitted.] Thus, although the juvenile court made findings that exposed him to a greater sanction, defendant had no due process right to have a jury make those findings beyond a reasonable doubt. Because *Apprendi* bears only on the process due in criminal proceedings, the case is simply inapplicable here." 327 Ill. App. 3d at 690-91.

*Beltran* relies on the lesser process due in a juvenile proceeding, thereby distinguishing juvenile proceedings from the principles announced in *Apprendi*.

The Supreme Judicial Court of Massachusetts in *Commonwealth v. Quincy Q.*, 434 Mass 859, 753 N.E.2d 781 (2001), found *Apprendi* applicable. In Massachusetts, the State must prove to a grand jury three factors to proceed against juveniles by indictment under the youthful offender statute, which authorizes increased sentences beyond the statutory maximum otherwise permitted for juveniles:

"(1) [T]he alleged offense was committed while the individual was between the ages of fourteen and seventeen years; (2) if he were an adult, the offense would be punishable by imprisonment in the state prison (*i.e.*, a felony); and (3) the individual was previously committed to the department of youth services, *or* the alleged offense involved certain enumerated firearms violations, *or* it involved 'the infliction or threat of serious bodily harm.' " 434 Mass. at 862 (citing Mass. Gen. L. ch. 119, § 54 [1996]).

While the *Quincy Q* court disagreed that the State met its burden of proof in the indictment, a clearly established requirement, the court continued to address the implications *Apprendi* had on the Massachusetts' system. The court held that *Apprendi* required a jury to find the facts making an indictment appropriate:

"Similar to the New Jersey hate crime statute, the youthful offender statute authorizes judges to increase the punishment for juveniles convicted of certain offenses beyond the statutory maximum otherwise permitted for juveniles, if the

requirements set forth in G .L. c. 119, § 54, have been satisfied. [Citation omitted.] We recognize that a juvenile court system, in which juveniles are given preferential treatment, is not constitutionally required. [Citation omitted.] However, once the Legislature enacted a law providing that the maximum punishment for delinquent juveniles is commitment to the Department of Youth Services (department) for a defined time period, see G. L. c. 119, § 58, any facts, including the requirements for youthful offender status, that would increase the penalty for such juveniles must be proved to a jury beyond a reasonable doubt. See *Apprendi v. New Jersey, supra.* Accordingly, if the Commonwealth determines to proceed against a juvenile by indictment, it must present at the grand jury stage sufficient evidence of the underlying offense to warrant a finding of probable cause that the underlying crime has been committed, [citation omitted], as well as sufficient evidence that the requirements set forth in G. L. c. 119, § 54, have been met.

. . . .

"At trial of offenses brought by indictment, the Commonwealth, of course, must prove to a jury beyond a reasonable doubt the elements of the underlying offense. It also must prove to a jury beyond a reasonable doubt those requirements set forth in G. L. c. 119, § 54 (*i.e.,* that the child was between the ages of fourteen and seventeen years when the alleged offense was committed; the offense is punishable by imprisonment in State prison; and the child was previously committed to the department, the alleged offense involves certain enumerated firearms violations, or the alleged offense involves the infliction or threat of serious bodily harm)." 434 Mass. at 864-66.

The court held that if the jury did not find the factors used to indict, the court would have to sentence the defendant as a delinquent. 434 Mass. at 867.

### Conclusion

*Apprendi* reviewed a law permitting a judge, after making a factual finding about the crime, to sentence a defendant beyond the statutory sentence authorized by the jury's verdict. In the present case, the decision under K.S.A. 38-1636 does not follow a finding of guilt for any crime. The decision under K.S.A. 38-1636 determines whether there is substantial competent evidence to authorize prosecution of a juvenile as an adult under the applicable criminal statute. If that decision is in the affirmative, the juvenile will be exposed to the statutory maximum sentence under the applicable criminal statute, which in most cases will exceed the statutory maximum disposition in the juvenile system. However, the juvenile tried as an adult will be subjected to the statutory maximum sen-

tence under the applicable criminal statute only after a jury has determined his or her guilt beyond a reasonable doubt.

The determination under K.S.A. 38-1636 does not involve guilt or innocence, but involves the determination of which system will be appropriate for a juvenile offender. As indicated above, we conclude that the Kansas procedure for authorizing adult prosecution under K.S.A. 38-1636 does not violate the Sixth and Fourteenth Amendments to the United States Constitution. The juvenile system is different. Jones' argument attempts to erode that difference and, thereby, potentially erode some of the protections offered by the juvenile system. As noted by this court in *Hitt*, Jones' argument, if adopted, would cause substantial disruption in the juvenile justice system. Before causing such disruption, this court would require a clear mandate from the United States Supreme Court or state legislation. Finally, sentences imposed following certification to stand trial as an adult must not exceed the statutory maximum and every fact or factor determining such sentences must be proved beyond a reasonable doubt by a jury or a judge as fact finder before imposition of the sentence.

## (5) Hearsay

Jones argues that the trial court violated the Confrontation Clause of the Sixth Amendment to the United States Constitution by admitting a videotape of the police interviewing Tensley.

The Sixth Amendment provides the criminal defendant the right to be "confronted with the witnesses against him." The Kansas Constitution gives the criminal defendant the right "to meet the witness face to face." Kan. Const. Bill of Rights, § 10. Although certain hearsay statements may be admissible as an exception to the hearsay rule, the Confrontation Clause may bar admission of such evidence. *Idaho v. Wright*, 497 U.S. 805, 814, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990). The appellate court reviews the trial court's decision to admit or exclude hearsay evidence under the abuse of discretion standard of review. *State v. Smith*, 271 Kan. 666, 670, 24 P.3d 727 (2001).

The record indicates the trial court played Exhibit 43 for the jury, which was an audiocassette tape. From the record, it is dif-

ficult to determine exactly what portions of the tape were played for the jury. The court first overruled Jones' objection that admitting both the tape and the transcript of the interview was cumulative. The prosecutor started playing the tape, and then stopped the tape because of Jones' hearsay objection. The tape was started again but there was another hearsay objection. The trial court announced its intention, out of the hearing of the jury, to instruct the jury to disregard any hearsay. The tape was started a third time, but stopped because the prosecutor wanted a bench conference. The record indicates the trial court said: "Go ahead and delete it and I won't caution them." The tape was started a fourth time and it played until the end. It is not clear from the record what parts the court was referring to when it referred to a deletion.

The transcript of Tensley's interview was included in the record on appeal. The transcript indicates the following hearsay:

"Q. Do you know how he got that injury?
"A. Somebody tried to rob him.
"Q. Did his aunt tell you how he got that injury?
"A. Yes.
"Q. Okay, what is the aunt's name and what did she tell you?
"A. Carletta and she told me that somebody tried to rob him.
"Q. Did she say that a white person had tried to rob him?
"A. Yes.
"Q. Explain exactly what she said.
"A. She had told me that, she said that Cody was coming down the street and his mouth was cut real bad and it looked like he was about to pass out. And he said somebody had tried to rob him and that's the night she took him to the hospital and then he had told them that somebody had tried to rob him. He said a dude had pulled out a gun and said he was about to shoot him. He said he broke and ran into this open field and he messed up his mouth because he was running in zig zags so he wouldn't get shot. That's all.
"Q. Did she ever say that the person that tried to rob Cody said he was the police?
"A. Yes.
"Q. Did she say if he had a badge or just said he was the police?
"A. Just said he was the police.
"Q. Did she ever describe the car that this person was driving?
"A. A red Thunderbird.
"Q. Did Cody himself ever tell you that this person tried to rob him?
"A. Yes.
"Q. Did he tell you the same story as his auntie?

"A. No, I mean he didn't, because he didn't tell me. He just told me somebody in a red Thunderbird tried to rob him, that's all because that's all I asked him. Then that was it. His mouth was messed up and he couldn't talk very much. You can hear what he was saying a little bit if there's not a lot a noise.
"Q: Did anyone tell you he used Santos' name?
"A. No."

The tape recordings of Tensley's statements were properly admitted as an exception to the hearsay rule because Tensley testified at trial and was available for cross-examination. However, Tensley's statements as to the aunt's account of the robbery constituted inadmissible hearsay. The admission of such statements over Jones' objection was error. See K.S.A. 2001 Supp. 60-460.

The State does not argue the statements were properly admissible but rather argues the error was harmless. The appellate court applies the federal constitutional error rule when there is a violation of a constitutional right. *State v. Lyons*, 266 Kan. 591, 598, 973 P.2d 794 (1999). Under the federal constitutional error rule, the appellate court must declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. 266 Kan. at 598.

Four eyewitnesses consistently described the events leading to Trzok's death. Three of those witnesses were able to identify Jones. Consistent with the four eyewitnesses, Jones' companion that night, Tensley, testified he and Jones beat and dragged Trzok out of the house. Importantly, the DNA evidence established that Trzok's blood was on Jones' shoe. Last, while the statements of Jones' aunt established motive, the State had already established motive through Tensley's testimony. Tensley established that he and Jones stopped at Fields' house because the car belonging to the person who had robbed Jones was parked there. Based upon the overwhelming evidence of guilt and the fact that properly admitted evidence established motive, we conclude beyond a reasonable doubt that the statements of Jones' aunt had little, if any, likelihood of having changed the result of the trial.

(6) Limitation of Cross-Examination

Jones argues the trial court improperly limited his cross-examination of Tensley, which violated Jones' rights under the Confron-

tation Clause. See *State v. Albright*, 271 Kan. 546, 550, 24 P.3d 103 (2001) ("The Confrontation Clause of the Sixth Amendment to the United States Constitution affords an accused the right to cross-examination.").

This court considered a similar argument in *State v. Rinck*, 256 Kan. 848, 888 P.2d 845 (1995). Rinck argued he should have been able to cross-examine an accomplice on the amount of prison time he would have received had he been tried as an adult. The court disagreed. The court noted the Confrontation Clause grants criminal defendants the right to cross-examination and that exposing a witness' motivation for testifying is a proper function of cross-examination. *Rinck* reasoned the defendant was able to cross-examine the accomplice about his plea bargain. 256 Kan. at 854-55. The court concluded that "the defendant was allowed reasonable latitude in inquiring as to the nature of the bargain [the accomplice] had made with the State." 256 Kan. at 855.

*Rinck* supports our conclusion that no error occurred. Jones was able to establish for the jury that Tensley was motivated by his plea bargain with the State and that he could have received up to 34 months in prison. Jones established that Tensley might not have to serve 15% of that sentence. Further, Jones was able to establish for the jury that Tensley had already served 18 months. The only link missing for the jury was the connection between time served and the sentence eventually imposed, *i.e.*, that the one would be subtracted from the other to determine how much time Tensley *had yet to serve*. The trial court did not abuse its discretion in limiting the scope of cross-examination. Jones clearly established the bias for the jury. The court offered Jones reasonable latitude in allowing him to cross-examine Tensley.

(7) Prosecutorial Misconduct

Jones argues the prosecutor committed sufficiently egregious misconduct to warrant a reversal of his conviction by (1) improperly commenting on the credibility of Jones' expert, and (2) stating facts not admitted in evidence during closing arguments.

The court in *State v. Pabst*, 268 Kan. 501, 505, 996 P.2d 321 (2000), described the approach to prosecutorial misconduct in the case of closing argument:

"The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. [Citation omitted.]"

The appellate court considers three factors to determine whether a new trial should be granted because of prosecutorial misconduct: (1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. 268 Kan. at 508.

Normally, there can be no reversible error based on prosecutorial misconduct absent a contemporaneous objection. *State v. McCorkendale*, 267 Kan. 263, 278, 979 P.2d 1239 (1999). "If the prosecutor's statements, however, rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection." 267 Kan. at 278.

### *Improper Comments on Witness Credibility*

Jones argues the prosecutor improperly commented on the defense witness' credibility. During closing arguments, the prosecutor made the following argument:

"Then the DNA evidence. You've heard from Linda Netzel. She is a trained professional trained to do forensic DNA. Forensic DNA is different than doing birds and fish and horses and wheat and all that other stuff. You know why? Because it's serious business. Coming in and testifying about criminal matters is serious. If a bird is—if there is a mistake on bird DNA or something else, the consequences are not going to be as severe. And the regional crime laboratory in Kansas City, Missouri knows that. They do thousands and thousands of cases. She's come in and testified hundreds of times. If there was a problem with the way they were doing their DNA analysis, don't you expect it would have been fixed by this point in time?

"Instead, what we have is somebody that comes into a case that gets paid up to $120,000 a year to come in and criticize people that do this kind of work. You can test his credibility by that, just like you test [E.G.] and [S.W.'s] credibility because they get paid to provide services. Right? The only difference being [S.W.] and [E.G.] trade their services for crack cocaine."

Jones failed to object to the above comments.

Jones complains that comparing his expert to "crack-prostitutes is outside the realm of fair comment." Initially, it should be noted nothing in the above quotation is unsupported by the evidence at trial. S.W. testified she was selling sex for money and that she was buying crack that day. E.G. testified that she had sold sex for drugs in the past. Dr. Stetler testified he had made up to $120,000 for his expert opinions.

The prosecutor's comments were not outside of the "considerable latitude" the prosecutor is allowed in discussing the evidence. First, the jury was instructed that the arguments of counsel were not evidence and that if the counsels' arguments were unsupported by the evidence, they should be disregarded. Second, Jones misconstrues the nature of the prosecutor's comments. The prosecutor was making the point for the jury that Dr. Stetler is paid for his testimony and that this arrangement may influence what he had to say. Exposing the bias or motive for testifying is a proper subject for cross-examination, *State v. Jacques*, 270 Kan. 173, 182, 14 P.3d 409 (2000), and, by extension, the prosecutor is free to argue this point to the jury if the evidence has established the facts. That Jones finds the argument disagreeable or unfavorable is not sufficient to render the argument improper.

Jones also complains that the above argument and, in particular, the following sentence from the above quotation, improperly bolstered the credibility of the State's DNA expert: "If there was a problem with the way they were doing their DNA analysis, don't you expect it would have been fixed by this point in time?" This sentence was not beyond the considerable latitude permitted to a prosecutor in closing argument. The prosecutor was asking the jury to use its collective common sense to conclude the State's DNA analysis was sufficiently reliable to conclude that Trzok's blood was on Jones' shoe.

### Arguing Facts Not in Evidence

Jones argues the prosecutor improperly argued facts not in evidence, based upon the following statements from the prosecutor's closing argument:

"And Ms. Pryor wants to say, well, what motive does the co-defendant have to lie? And she brings up the idea about this plea bargain, that's his motive to lie. Well, folks, look at the evidence. If this were a case against LaKevis Tensley—I presented my evidence. We have no eyewitnesses that can identify him. The only thing linking LaKevis Tensley to this crime is LaKevis Tensley's statement.

"If I present that to a jury, what is the crime that he's just committed? The crime of aggravated battery. He goes in and he beats the guy up, renders him unconscious, then he runs out. Because he tells you I didn't have any idea he was going to kill him, I thought we were going to beat him up. To be able to be guilty of murder, he would have to know what was going on. He would have to be linked to that murder. And I submit to you there would not be enough evidence to be able to be submitted for that to occur. Did I offer him or did the district attorney's office offer him a plea? Yes. Why? Because sometimes you have to deal with the lesser of two evils to get to the end result."

Jones failed to object to these remarks during the prosecutor's closing arguments.

Jones argues the prosecutor argued two facts not in evidence, one of which was a misstatement of the law: (1) The State presented in Jones' trial all the evidence that could have been used against Tensley; and (2) that Tensley could not have been convicted of first-degree murder based on his involvement in Trzok's death.

The prosecutor was arguing to the jury how weak a potential first-degree murder case would be against Tensley. This was in response to the defense counsel's extensive cross-examination of Tensley regarding his plea bargain. The prosecutor argued that the evidence presented at trial did not support first-degree murder. The defense counsel was free to take the opposite position. The trial evidence supports the prosecutor's closing remarks.

### (8) Pro Se Arguments

#### Ineffective Assistance of Counsel

Jones filed in this case his handwritten supplemental brief. In it, he argues his conviction should be overturned because his conviction violated his right to due process because his trial counsel pro-

vided ineffective assistance of counsel. In *State v. Carter*, 270 Kan. 426, 433, 14 P.3d 1138 (2000), this court held that it may in some cases be appropriate for this court to consider an argument of ineffective assistance raised for the first time on appeal:

"As a general rule, we would not consider a defendant's assertion of ineffective assistance of counsel before the trial court has had an opportunity to assess the performance of counsel. [Citation omitted.] However, such assessment by the trial court is not necessary where the record on appeal is sufficiently complete for this court to decide the issue in a direct appeal. Here, the acts of counsel that Carter relies on are not disputed and are clearly reflected in the record. It would serve no purpose to remand to resolve the issue. The record on appeal is sufficient for this court to consider Carter's constitutional claims, including ineffective assistance of counsel."

The record in this case reveals Jones filed a pro se motion to change counsel almost a year before the trial in this case. Jones alleged that his counsel, Arlene Pryor, was in violation of the Model Rules of Professional conduct. See Supreme Court Rule 226 (2001 Kan. Ct. R. Annot. 305). Jones alleged Pryor had failed to communicate with him and failed to file "several pre-trial motions to protect his interest." At a hearing on June 9, 1999, the district court quizzed Jones on his complaint against his attorney:

"THE COURT: What's your problem now? Tell me what's—why you don't want Miss Pryor to represent you anymore?

"MR. JONES: Because I feel that she's not defending me the way she should have been. I don't trust her, and it's very hard to work with her, and I asked her to file motions for me. She refused to. I really don't trust her.

"THE COURT: What motions did she refuse to file for you?

"MR. JONES: A motion to—a motion to—I want a separate trial from my co-defendant.

"THE COURT: Yeah, you got that. What else?

"MR. JONES: That's it.

"THE COURT: Well, what do you mean she didn't file—what else didn't she file for you that you're so smart about? Tell me this, about all this law you know about?

"MR. JONES: Well, I just don't trust her.

"THE COURT: Well, I don't care. Do you have some money to hire a lawyer?

"MR. JONES: No.

"THE COURT: All right.

"MR. JONES: I'm asking you if the—I'm asking you out of the kindness of my heart, could you please get her off my case and assign me a lawyer?

"THE COURT: I'm not being kind today. I want to know a good reason why you don't want her on your case besides you don't trust her. If you tell me why you don't trust her and convince me of that, I'll give you another lawyer.

"MR. JONES: She tell me—she come up and visit me a day before court day, and my mom's out of town, and my family, I don't have the time to write them so they can come to my court day, only thing—

"THE COURT: You tell me why you want a new lawyer. Don't give me a bunch of this baloney. You're in serious trouble, mister. You're facing 40 years of hard time in the penitentiary. Cut out the crud here and tell me why you don't trust her and why you don't think she's a good lawyer."

The court advised Jones to cooperate with Pryor, believing her to be one of the best he could appoint for him. The court denied the motion for a new attorney. It is clear from the above quotations that the court had faith in the representation Pryor was providing Jones. Further, it is clear from the court's frustration that it believed Jones was failing to cooperate with Pryor and that his failure was the cause of any problems with his defense. Jones offers nothing to indicate the court was in error on these points; thus, the court did not err in failing to appoint Jones new counsel. Moreover, the record demonstrates that Jones was well represented throughout all proceedings before the trial court. His claim of ineffective assistance of counsel fails.

### Other Arguments

It is difficult to clarify specific arguments made by Jones in his pro se brief. Most of his supplemental brief is a random discussion of various Kansas and federal cases. Not only is his supplemental brief lacking in citations to the record, but the brief is also mostly devoid of specific references to matters that could potentially be found in the record. As best as we could determine, Jones makes the following arguments: (1) The trial court erred in sustaining the State's objection to his cross-examination of Fields; (2) the prosecutor committed misconduct by (a) referring to the State's DNA lab, (b) explaining why she offered Tensley the plea bargain, (c) comparing Dr. Stetler to a prostitute, (d) arguing the jury did not need all the pieces to the puzzle to see the whole picture, (e) making gestures and other actions to discredit Jones' expert witness, and (f) engaging "in a conspiracy [with Pryor] to deny [Jones]

his constitutionally protected rights"; (3) the State delayed the disclosure of the DNA results; (4) the prosecutor failed to disclose "certain types of evidence"; and (5) the trial judge committed "judicial misconduct by making prejudicial comments about Jones."

These arguments can be collectively disposed of as they fall into certain categories. First, some of the arguments overlap with Jones' appellate counsel's argument. Jones' arguments of prosecutorial misconduct regarding the DNA lab, the plea bargain, and Dr. Stetler were all resolved in our above discussion.

Some of the arguments are raised for the first time on appeal. An argument not presented to the trial court will not be considered for the first time on appeal. *State v. Smith*, 268 Kan. 222, 243, 993 P.2d 1213 (1999). For example, Jones' claim of judicial misconduct and the failure to disclose evidence are raised here for the first time. Further, to the extent Jones' argument relates to the delay caused by the DNA evidence, it is clear Jones presented in his case in chief an expert, Dr. Stetler, who had reviewed the State's DNA evidence. Dr. Stetler was able, to the best of his ability, to call into question the reliability of the State's evidence.

Some of the arguments are devoid of merit. Falling into this category are the conspiracy between the prosecutor and his counsel and his argument that the prosecutor committed misconduct by arguing that the jury did not need all the pieces of the puzzle to see the whole picture.

Regarding the gestures, the record reveals the following occurred out of the hearing of the jury during Dr. Stetler's direct examination:

"MS. PRYOR: Would there be any way that counsel [the prosecutor] could stop shaking her head?
"THE COURT: Don't shake your head back and forth.
"MS. MOREHEAD [prosecutor]: I wasn't
"MS. PRYOR: You were. I saw you.
"MS. MOREHEAD: I was looking over to the— —
"THE COURT: I understand you disagree with what they are saying and you are shaking your head. Don't do that."

The record does not reveal the prosecutor's gestures generated any further attention. The above actions did not deny Jones a fair trial.

Jones' argument that the court improperly sustained the State's objection to his cross-examination of Fields is without merit. The record reveals the following from Fields' recross-examination:

"Q. Sir, isn't it correct when you talked to the police you gave them a description of what this person looked like, right?

"A. Yes.

"MS. MOREHEAD: Judge, could we approach?

"THE COURT: I don't think you need to approach. I believe it's beyond redirect. She was just asking about the statement.

"MS PRYOR: Well, she was asking about identification issues, Judge.

"MS. MOREHEAD: Judge, I confined it.

"THE COURT: I believe it was confined to the two statements.

"MS. PRYOR: Okay."

The decision to limit the scope of cross-examination is subject to abuse of discretion. See *State v. Vargas*, 260 Kan. 791, 798, 926 P.2d 223 (1996). Jones' attorney failed to make any argument why the question was not beyond the scope of the redirect examination. A review of the State's redirect examination of Fields does not reveal she asked any questions regarding a description. It cannot be said the court abused its discretion. These arguments raised by Jones in his pro se brief fail to provide any basis for relief.

Affirmed.