No. 87,252

STATE OF KANSAS, *Appellee*, v. RONELL WILLIAMS, *Appellant*.

(85 P.3d 697)

Opinion
filed March 19, 2004.

*Patrick H. Dunn*, assistant appellate defender, argued the cause and was on the brief for appellant.

*Jerome A. Gorman*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Ronell Williams was convicted by a jury of two counts of premeditated first-degree murder, one count of aggravated robbery, and one count of aggravated burglary. He was sen-

tenced to two hard 50 terms, a term of 59 months, and a term of 32 months, all to run concurrently. He appeals his convictions and sentences.

At approximately 6 p.m. on August 4, 1999, their daughter and granddaughter found Wilbur and Wilma Williams, who were not related to the defendant, lying on their kitchen floor. An emergency medical technician who was dispatched to the Williams' house in response to the daughter's 911 call determined that both victims were dead. The bodies were lying in pools of blood that had begun to dry at the edges, which indicated that the injuries had occurred some time earlier.

Police were dispatched to the Williamses' residence shortly after 6 p.m. No sign of forced entry was found, and the house had not been ransacked. Police found seven spent 7.65 mm. shell casings in the kitchen area. One additional spent shell casing of the same kind was found in the body bag in which Wilma Williams' body was transported from the scene.

An autopsy showed that Wilma Williams had suffered four gunshot wounds—two to the right side of her face, one to the left side of her neck, and a graze wound across her left hand. Three bullets were recovered from Wilma Williams' body during the autopsy. The pathologist testified that in his opinion she died as a result of multiple gunshot wounds, which caused a combination of blood loss, shock, and stress on her heart rather than immediate death.

An autopsy of Wilbur Williams' body showed that he suffered five gunshot wounds—one to the left side of his face, one to the left side of his head behind the ear, one to the left side of the back chest, one to his left hand, and one to his right upper arm. Four bullets were recovered from Wilbur Williams' body during the autopsy. The pathologist testified that in his opinion Wilbur Williams died as a result of multiple gunshot wounds, which caused blood loss rather than immediate death.

Police found that the door from the kitchen to the basement stairs was open and that the basement door to the outside also was open. Outside there was an empty carport. Mr. and Mrs. Williams owned a 1992 white Dodge Spirit, which their son had seen there a few days earlier.

On August 3, the day before the bodies of Wilbur and Wilma Williams were found, a woman who lived approximately 2 blocks away from the Williamses arrived home and found that her back door had been pried open. The house had been unoccupied only about an hour. Several diamond rings, three cameras, a .32 caliber pistol, and a full box of Fiocchi brand .32 caliber automatic ammunition were missing.

During the afternoon of August 3, the Williamses' next door neighbor, who was going into his house through the back door, heard what he thought were firecrackers. Minutes later he heard the squealing of tires. A young man who had grown up two houses away from the Williamses was coming home in the afternoon when he saw two young, black male teenagers driving the Williamses' car out of their driveway.

At approximately 2 a.m. on August 5, 1999, the car that had belonged to the Williamses was found burned out in a parking lot. On August 7, an informant told police that Michael Elias, Kendall Elias (Kendall), Jeffery Brown (Jeffery), and Jeremy Brown had been in the car. Jeffery and Kendall told police that they had been picked up by identical twins named Ronell and Donell.

Jeffery, who was 16 at the time of trial in December 2000, testified that he and Kendall rode around with the Williams twins until the twins said they had to go home before their mother woke up. The twins told Jeffery and Kendall to keep the car and meet them back at their house with it the next night. Jeffery and Kendall drove the car to Kendall's house, Jeffery went home and gave his brother, Jeremy, the keys. Jeremy and Jeffery picked up Michael Elias and drove around in the car the next morning, but did not drive it back to the twins' house later because by then they had seen on television that the car was stolen. Michael Elias gave the car to someone named "Jay".

On August 8, police officers searched the Williams twins' house, which lay approximately a half mile from Wilbur and Wilma Williams' house. A 7.65 mm. live round was found in the twins' room. An empty box which had held Fiocchi .32 caliber shells was found along the fence line separating the suspects' house from the neigh-

boring property. Four shell casings and four gauge tokens were found in the back and side yards.

A firearms examiner testified that all the shell casings recovered by the police were of the Fiocchi brand, of the same caliber—7.65 mm. or .32 caliber automatic, and were fired from the same gun— most likely a .32 caliber automatic or semiautomatic handgun.

In a statement to police, Ronell Williams said that Donell had burglarized a house and stolen a .32 caliber pistol, which they fired in their own backyard. They walked over to the house of a friend and were walking back home when they saw Wilbur Williams out by his mailbox. Ronell took the gun from Donell and put it to Mr. Williams' head and ordered him to the backyard where Mrs. Williams was working in the garden. Ronell told Mr. Williams that they were planning to rob him, and they ordered Mr. and Mrs. Williams to go into the house through the back door and up the stairs. In the kitchen, the couple whispered to one another and Mrs. Williams picked up their cordless telephone. Donell took the telephone from her and put it in the southwest bedroom, where police later found it. Donell rummaged through the house trying to find something of value and found car keys in Mrs. Williams' purse. Ronell told his brother to go get the car because he was going to have to kill the old people. Donell went down the stairs to get the car. Because Mr. Williams grabbed for a knife, Ronell fired the gun. No one was hit, but it made Mr. Williams drop the knife. Mr. Williams fell to his hands and knees, and Ronell shot him four times. Mrs. Williams became hysterical and laid down on the floor on her back screaming. Ronell shot her in the face from close range. Ronell left the house, got into Mr. and Mrs. Williams' white Dodge, and left the scene.

Williams first argues that his evidence as to mental disease or defect should not have been limited to the mental examination report filed pursuant to K.S.A. 22-3219(2).

The required notice and procedure for a defense of mental disease or defect that would exclude criminal responsibility are set out in K.S.A. 22-3219. Subsection (1) requires service and filing within 30 days after entry of a not guilty plea of a written notice of a defendant's intention to assert a defense of mental disease or

defect. Subsection (2) sets out the procedures governing mental examination of a defendant who files a notice of intention to assert a defense of mental disease or defect. It provides that "[a] report of each mental examination of the defendant shall be filed in the court and copies thereof shall be supplied to the defendant and the prosecuting attorney." K.S.A. 22-3219(2).

During trial, after the State had called its final witness and the trial court overruled defendant's motion for judgment of acquittal, the State argued that Dr. Roosa, a clinical psychologist, should not be allowed to testify for defendant for several reasons, one reason being that his report did not bear on the issue of mental disease or defect that would exclude criminal responsibility. It was stated during the discussion of the State's request to exclude or limit Roosa's testimony that, at the time Roosa made his report, he had not interviewed the defendant. According to defense counsel, Roosa interviewed the defendant after the report was made. The trial court noted that no supplementary report had been submitted stating Roosa's conclusions after interviewing the defendant. The State further objected to Roosa's proposed testimony on the ground that its cross-examination of the witness would be seriously hampered by the lack of an addendum to his report.

In order to give the State an opportunity to interview Dr. Roosa with regard to his post-report meetings with the defendant and conclusions, the trial court recessed the trial proceedings at 3:15 p.m. on December 6th to reconvene at 9 a.m. the next morning. After the jury had been excused, the trial court questioned Roosa about what had occurred after his report was filed. Roosa said that a new psychological examination had been done at the University of Kansas Medical Center, he had examined the report of the new testing, he had examined notes of Dr. Logan that he had not had before, and he had conducted at least 3 hours of clinical interviews with the defendant. Roosa also mentioned examining the defendant's school records and a letter from the defendant's mother. Roosa said that he had not compiled a second report. Asked if his findings changed after the initial report was submitted, Roosa said: "I think to be added onto, yes, I think there are factors seen and been able to look at more closer that I don't suspicion somewhat."

Roosa said that he did not recall being asked by defense counsel to submit a report after finishing his evaluation of the defendant. The trial court said to Roosa:

"I guess my problem is we are in the middle of trial and the State and, frankly, I don't know even if the defendant knows exactly what you're going to say and why you're going to say what you're going to say and certainly that would lead the court to order an interview with the prosecutor in this case before you testify so that he has some idea of what your opinion is and why and how you got there."

The next morning the trial court gave counsel an opportunity to argue their positions on the question of Dr. Roosa's testifying. Defense counsel argued that it should be enough that the State had notice of defendant's intent to present a defense of mental disease or defect excluding criminal responsibility, had the initial report, and had defendant's witness list, which included Roosa. The State argued that the defendant had not satisfied the statutory requirement despite being prodded by the State's motion in limine, which was filed 4 months before trial began in December 2000. The State indicated it had received nothing with regard to any evaluation conducted by Roosa after May 15.

The trial court stated:

"The statutory language is clear that any, any examination of the defendant, each mental examination of the defendant shall be filed with the court, with defense counsel and with the prosecuting attorney. At the close of the State's evidence and with the defense ready to present their testimony is the first time anybody other than defense counsel perhaps and, of course, defense witness knew that other things, other examinations had been done, other reports had been seen, referred to and incorporated then into a final decision about the defendant's mental status at the time of the commission of these crimes. The State was and is unprepared to cross-examine, to test the conclusions reached by the defendant's expert witness with no notice. The order and ruling of this court will be that the defense's expert witness may testify about the report presented to this court and the parties. I believe the testing date was October the 20th of 1999. That's the only date that I've been able to glean from the report. It would appear that this report was based solely upon a number of procedural tests used; that, if I'm not mistaken, were actually administered to the defendant by someone other than Doctor Roosa, but in any event, he used these results to present a tentative, initial blind analysis, I guess is the phrase used to describe what he had done, and he made certain conclusions based upon this testing without having seen the defendant. It would appear based upon our record outside the presence of the jury, the conversation yesterday, that he has since done—had three one hour sessions

at least with the defendant. He has read and incorporated all of the other reports submitted to the court and the parties and I would assume taken the initial test and then spun that into something that he and the defendant feel is much stronger and more objective with a lot more foundation to establish the defense of mental disease or defect. I cannot and it will be the order of this court that the witness will not testify about anything done after the submission of his initial October of 1999 report since his endeavors were not filed with the court, the State or the defendant to the best of my knowledge. It's just as if they had not been done. He may testify to the conclusions he reached from the testing that he appears to have had done with the defendant and anything contained in that report, but the foundation for that report remains, as far as I'm able to ascertain, the procedures and tests administered to the defendant at that time and the scoring that he did, the State will be precluded from cross-examining the defendant as to what he could have, should have or would have done. If they do so and open the door to what could have or should have been done and this witness had, in fact, done it even after the fact, that's a different ball game, but as we stand now I cannot let your witness testify to anything other than what is contained in his initial report."

Dr. Roosa testified on behalf of defendant. Asked for his opinion whether defendant had any diagnosable mental disorders that would affect his ability to form the intent to kill someone, Roosa stated:

"I came to the conclusion he suffered from severe problems of defect in social judgment and that— and having a tremendous difference in the right brain function, which has to do with—the left is on verbal function which makes him often sound like he knows more of what is going on than he really does and his right brain function has to do with what we call performance, being able one, to see the big picture under the social context of what he's in, the situations that he's in and to be able to put into action what he does see and does understand. He's, in effect, operating with one very deficient brain function, so it's a very lopsided function. People like that—the extreme of that is where there is split brain function where the right brain has been really cut off and only the left brain is operating. The extreme of that is that those people are totally blind to social form neurosis and cannot pick up on the usual cues that most of us have regarding the appropriateness of actions. In this case though he still has right brain. It's seriously defective in its use."

Dr. Roosa further testified that his conclusion about the defendant's right brain being defective was based on the results of the Wechsler Intelligence Scale for Children that was administered to the defendant. According to Roosa, the defendant's test scores show the difference between the left and right sides of his brain:

"Verbal IQ is 83, which is kind of a border line below average, low average level and the performance IQ, which is the right brain function is in the mentally retarded level." Right brain functions, Roosa testified, "are necessary for seeing the big picture, being able to process information in the middle of a circumstance to see the big picture, to go well beyond what might be meaningful kind of thoughts that might occur and to think it all the way—help you think it all the way through."

In response to the question whether, in his opinion, the defendant's disorder would affect his ability to premeditate the killings, Dr. Roosa testified:

"I don't see any evidence of any skillfulness of premeditation and if there is a thought about something, if a situation comes up what we all do we have a thought about something, we have some idea of what we are going to do, but then as the reality hits us, as we get closer to, we begin to make adjustments and that ability to make those adjustments, that ability to talk to the left side of the brain is seriously deficient."

Dr. Roosa added: "You can have a meaningful intent. You can have a thought at the moment, but he has those thoughts, but then the reality of the situation doesn't strike him and, therefore, it inhibits and reduces the effectiveness of modulating of what might be the original thoughts." Roosa testified that the defendant had an actual incapacity, not just a character trait or something derived from his personality. In further explaining the incapacity, Roosa testified:

"The testing, as I said, indicates very clearly that he's got this large discrepancy between right and left brain function and as a result of that we have to see that as an impairment in right brain and as a result of that behavior we often call impulsive is simply behavior that is not stopped by the ability to really see what is going on, what the situation really is about given the situation. Ronell is not a person without any caring or any kind of feeling. He's very much more reactive and because of those—because of those impairments."

On cross-examination Dr. Roosa reiterated that in his opinion, because of his mental disorder, Williams could not premeditate or think things over beforehand.

Although he does not argue that the trial court misinterpreted the statute in requiring a second report by Dr. Roosa, defendant

agrees with the State that this matter depends on interpretation of K.S.A. 22-3219. Interpretation of a statute is a question of law, and the court's review is unlimited. *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003).

On appeal, defendant contends that he should not have been penalized for Dr. Roosa's failure to file a second report. The filing required by K.S.A. 22-3219(2), however, is not the responsibility of the witness. Defendant also contends that the trial court should have, but failed to, consider lesser sanctions for the statutory violation. Not one of the cases he relies on involved the statutory notice requirement at issue here. Moreover, the sanction imposed by the trial court was a lesser sanction certainly than excluding the testimony of Dr. Roosa and was well tailored to fit the peculiar circumstances of this case. We find no error.

Williams next argues that the failure to comply with K.S.A. 38-1636(c)(2) deprived the district court of jurisdiction to try him as an adult.

This issue again involves statutory interpretation, which is a question of law over which the court has unlimited review. *Maass*, 275 Kan. at 330.

K.S.A. 38-1636 provides for prosecution of a juvenile as an adult in certain circumstances. The procedure may be commenced by the county or district attorney filing a "motion requesting that the court authorize prosecution of the respondent as an adult under the applicable criminal statute." K.S.A. 38-1636(a)(1). Subsection (c)(1) provides that, upon receiving such a motion, the court is to conduct a hearing on the motion. K.S.A. 38-1636(c)(1) further provides: "The court shall give notice of the hearing to the respondent, each parent of the respondent, if service is possible, and the attorney representing the respondent." K.S.A. 38-1636(d) provides in part: "If the respondent fails to appear for hearing on a motion as established in subsection (a) after having been served with notice of the hearing, the court may hear and determine the motion in the absence of the respondent." See *State v. Muhammad*, 237 Kan. 850, 703 P.2d 835 (1985) (essentials of due process were met even though respondent's failure to appear at K.S.A. 38-1636 hearing was involuntary).

A joint hearing was conducted in this case, *In the Matter of Donell Williams*, case No. 99JV1585 and *In the Matter of Ronell Williams*, case No. 99JV1586, on October 26, 1999. The State concedes that at the hearing the court did not inform the defendant of the items listed in K.S.A. 38-1636(c)(2).

The defendant argues on appeal that the court's failure deprived the trial court of jurisdiction in his prosecution as an adult. K.S.A. 38-1636(c)(2), which became effective in May 1999, provides:

"(2) At the hearing, the court shall inform the respondent of the following:
(A) The nature of the charges in the complaint;
(B) the right of the respondent to be presumed innocent of each charge;
(C) the right to trial without unnecessary delay and to confront and cross-examine witnesses appearing in support of the allegations of the complaint;
(D) the right to subpoena witnesses;
(E) the right of the respondent to testify or to decline to testify; and
(F) the sentencing alternatives the court may select as the result of the juvenile being prosecuted under an extended jurisdiction juvenile prosecution."

Although the statute provides that the court shall inform the respondent of the items listed in subsection (c)(2), if the respondent is not present for the hearing, as permitted by subsection (d), the court cannot inform the respondent at the hearing of the items listed in subsection (c)(2). Hence, contrary to the defendant's contention, the fact the court did not inform the respondent of the items in subsection (c)(2) could not logically be a basis for depriving the district court of jurisdiction of the criminal prosecution.

Moreover, the authority cited by defendant, *State v. Jones*, 273 Kan. 756, 47 P.3d 783, *cert. denied* 537 U.S. 980 (2002), does not support his proposition that failing to inform a respondent of the items listed in K.S.A. 38-1636(c)(2) deprives the district court of jurisdiction. In *Jones*, the defendant contended that the procedure set out in K.S.A. 38-1636 "runs afoul of *Apprendi* because the fact that he should be tried as an adult is made by a judge resulting in a penalty beyond the statutory maximum." 273 Kan. at 770. Jones further contended that he was denied due process of law for failure to comply with K.S.A. 38-1636(c)(1) and 38-1636(e). Failure to comply with 38-1636(c)(2) was not raised on appeal in *Jones*.

As the State points out, the statute is silent about the consequence, if any, of the court's failing to inform respondent of the items listed in subsection (c)(2). The State would have the court contrast the absence of any consequence in K.S.A. 38-1636 with the stated imperative that a criminal case be dismissed for failure to comply with the speedy trial statute, K.S.A. 22-3402(1).

Defendant cites *State v. Hitt*, 273 Kan. 224, 236, 42 P.3d 732 (2002), *cert. denied* 537 U.S. 1104 (2003), as approving the use of juvenile adjudications in calculating criminal history scores for the sentencing guidelines because of the procedural safeguards afforded by the Juvenile Justice Code. Defendant seems to contend that informing respondent of the items listed in K.S.A. 38-1636(c)(2) is among the procedural safeguards essential to guaranteeing the constitutional validity of juvenile adjudications. Defendant, however, was not adjudicated as a juvenile.

In arguing that failure to inform respondent of the items listed in subsection (c)(2) divests the district court of jurisdiction of the criminal prosecution, defendant likens the K.S.A. 38-1636 hearing to a criminal defendant's entering a guilty plea. Because by pleading guilty a defendant is giving up constitutionally guaranteed rights, including trial by jury, the entry of a guilty plea "is such a critical stage within our system of criminal justice that the only sure method of demonstrating the plea is voluntarily and knowingly entered is for the trial judge to follow a detailed checklist covering every aspect of K.S.A. 22-3210." *State v. Moore*, 16 Kan. App. 2d 472, Syl. ¶ 5, 825 P.2d 537 (1992). The State disputes the comparison, pointing out that a juvenile waives no rights during the hearing to determine whether he or she should be adjudicated as a juvenile or prosecuted as an adult.

In any event, there is no statutory or case law basis for divesting the district court of jurisdiction if defendant was not advised of the items specified in K.S.A. 38-1636(c)(2). Morever, because respondents need not be present for a 38-1636 hearing, there is no logical basis for divesting the district court of jurisdiction if defendant was not advised at the hearing of the subsection (c)(2) items. Some sanction may be appropriate, but it would not include divestiture of district court jurisdiction.

Williams also argues that the failure to advise him of the rights enumerated in K.S.A. 38-1636(c)(2) violated his Sixth Amendment right to a jury determination as required under *Apprendi.*

The court's review of this constitutional question is unlimited. See *Hitt*, 273 Kan. at 226.

Defendant concedes that in *Jones*, 273 Kan. 756, the court rejected the argument that because prosecution of a juvenile as an adult substantially increases the potential penalty for an offense, the Sixth and Fourteenth Amendments require jury determination of the question whether a respondent should be prosecuted as an adult. Williams would distinguish *Jones* from the present case, however, because in this case he was not informed of his rights as enumerated in K.S.A. 38-1636(c)(2). He contends that what removed the adult certification proceeding from the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 147 (2000), in *Jones* were the juvenile's right to counsel and the procedural safeguards provided by 38-1636(c)(2).

After discussing the procedural safeguards of K.S.A. 38-1636 and quoting K.S.A. 38-1636(c)(2), the court stated in *Jones*: "We conclude that the above reasons, as well as the other procedural safeguards provided for in K.S.A. 38-1636, are sufficient and support a determination that certification proceedings under our statutory scheme for the care and treatment of juveniles fall outside the dictates of *Apprendi.*" 273 Kan. at 774. The State contends that the procedural safeguards referred to in *Jones* are found in K.S.A. 38-1636(c)(1), (e), and (f)(1). Subsection (c)(1) requires the court to give notice of the certification hearing to the respondent; his or her parents, if possible; and counsel. Subsection (e) identifies factors that must be considered by the court in determining whether prosecution as an adult should be authorized. Subsection (f)(1) provides that a determination to prosecute as an adult must be based on substantial evidence.

In *Jones*, the court discussed at some length the interface of *Apprendi* with the statutory provision for prosecuting certain juveniles as adults, and first made it clear that the procedural safeguards of K.S.A. 38-1636 were among the factors weighing against application of *Apprendi*. Consideration of the procedural safe-

guards was far from the end of the analysis. The court continued by discussing decisions of other courts, which depended little or not at all on procedural safeguards in relating the juvenile proceeding to *Apprendi*'s sphere:

"The Kansas Court of Appeals has considered and rejected the precise argument raised by Jones. *State v. Hartpence*, 30 Kan. App. 2d 486, Syl. ¶ 4, 42 P.3d 1197 (2002). The *Hartpence* court classified *Apprendi* as dealing with the sentencing phase of a prosecution, while the K.S.A. 38-1636 procedure is a jurisdictional matter where the decision is made which court will resolve the case. 30 Kan. App. 2d at 496." 273 Kan. at 775.

The court then proceeded to quote extensively from the opinions of the New Mexico Court of Appeals and the Appellate Court of Illinois rejecting an argument similar to the one made in *Jones*; and the opinion of the Supreme Judicial Court of Massachusetts, finding that *Apprendi* was applicable to adult certification. 273 Kan. at 775-77. The Court of Appeals then concluded:

"*Apprendi* reviewed a law permitting a judge, after making a factual finding about the crime, to sentence a defendant beyond the statutory sentence authorized by the jury's verdict. In the present case, the decision under K.S.A. 38-1636 does not follow a finding of guilt for any crime. The decision under K.S.A. 38-1636 determines whether there is substantial competent evidence to authorize prosecution of a juvenile as an adult under the applicable criminal statute. If that decision is in the affirmative, the juvenile will be exposed to the statutory maximum sentence under the applicable criminal statute, which in most cases will exceed the statutory maximum disposition in the juvenile system. However, the juvenile tried as an adult will be subjected to the statutory maximum sentence under the applicable criminal statute only after a jury has determined his or her guilt beyond a reasonable doubt.

"The determination under K.S.A. 38-1636 does not involve guilt or innocence, but involves the determination of which system will be appropriate for a juvenile offender. As indicated above, we conclude that the Kansas procedure for authorizing adult prosecution under K.S.A. 38-1636 does not violate the Sixth and Fourteenth Amendments to the United States Constitution. The juvenile system is different. Jones' argument attempts to erode that difference and, thereby, potentially erode some of the protections offered by the juvenile system. As noted by this court in *Hitt*, Jones' argument, if adopted, would cause substantial disruption in the juvenile justice system. Before causing such disruption, this court would require a clear mandate from the United States Supreme Court or state legislation. Finally, sentences imposed following certification to stand trial as an adult must not exceed the statutory maximum and every fact or factor determining such

sentences must be proved beyond a reasonable doubt by a jury or a judge as fact finder before imposition of the sentence." 273 Kan. at 777-78.

Thus, it appears that the court's decision rested only in part on the procedural safeguards of K.S.A. 38-1636(c)(2). This impression is confirmed by the two syllabi related to this discussion:

"Procedural safeguards provided in the juvenile justice system, and specifically those safeguards in K.S.A. 38-1636, are sufficient to support a determination that certification proceedings of juveniles fall outside the dictates of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

"The juvenile tried as an adult will be subjected to the statutory maximum sentence under the applicable criminal statute only after a jury has determined his or her guilt beyond a reasonable doubt." 273 Kan. 756, Syl. ¶¶ 5 and 6.

With this dual basis for not applying *Apprendi* to juvenile proceedings and because the procedural shortcoming was confined to one aspect of a system of safeguards, the failure to advise defendant of the items enumerated in K.S.A. 38-1636(c)(2) does not bring the determination to prosecute Williams as an adult within the rule of *Apprendi*.

Williams next argues that the trial court abused its discretion in responding to the jury's question on premeditation.

Under K.S.A. 22-3420(3), a trial court has a mandatory duty to respond to a jury's request for further information as to the law of the case. The manner and extent of the trial court's response rest in the sound discretion of the trial court. *State v. Sperry*, 267 Kan. 287, 311, 978 P.2d 933 (1999).

During its deliberations, the jury asked, "How long beforehand does the thought have to occur to make it premeditation?" The word "beforehand" was circled. The district court responded, with no objection from counsel, "No particular amount of time is required to form premeditation." Later, the jury made this request: "Would like to have premeditation defined again. How long does the thought have to be beforehand to be premeditation? Does premeditation include a preconceived plan period. Explain the relation between intent and premeditation." The district court responded:

"Premeditation is a state of mind relating to a person's reasons and motives for acting as he or she did. Unless a person actually communicates his or her reasons

for taking another life, evidence of premeditation must be proved by circumstantial evidence. Such evidence however is sufficient to establish even the gravest offenses. Premeditation cannot be inferred from the use of a deadly weapon alone, but it may be inferred where other circumstances also exist. The circumstances which may give rise to an inference of premeditation include but are not limited to, one, the nature of the weapon used; two, a lack of provocation; three, the defendant's conduct before and after the killing; four, threats and/or declarations made by the defendant before and after the killing and five, lethal blows inflicted after the deceased was felled and rendered helpless. Premeditation means any length of time sufficient to form an intent to act. Please reread Instructions 7, 11 and 18."

Defendant states on appeal that the second response was given over the objection of defense counsel. Although defense counsel did not directly say that he objected to the trial court's proposed response, he expressed his dissatisfaction with it:

"Judge, I think that case is possibly taken from a set of facts that must have dealt with circumstantial evidence since it states it can be determined from the circumstantial evidence submitted. In this case we also have evidence of a mental defect which is not included and is not circumstantial evidence. That is not included in that instruction or in that proposed instruction regarding evidence. I think it just highlights then the State's evidence and not the defendant's evidence and does not allow us then to reargue the point that they should also consider the mental capacity that was at issue in this case."

On appeal, defendant concedes that the trial court's response, which was taken from *State v. Jamison*, 269 Kan. 564, 571-72, 7 P.3d 1204 (2000), was a correct statement of law in the circumstances of *Jamison*. He would distinguish the present case from *Jamison*, however, because the key issue in the present case was defendant's capacity to premeditate the murders. Thus, he argues, the trial court's answer should have included comment on the role of a mental defect on premeditation and could have been accomplished by directing the jury's attention to Instruction 22, the mental defect instruction.

Defendant cites *State v. Cathey*, 241 Kan. 715, 730-31, 741 P.2d 738 (1987), for the proposition that the trial court's response, without mention of his mental defect, emphasized the State's evidence over his own. *Cathey* involved a jury instruction rather than a response to an inquiry. In a case decided several years before *Cathey*,

the court disapproved instructing the jury regarding flight as an indication of guilt because such an instruction emphasized certain evidence. 241 Kan. at 730. In violation of the rule, the trial judge in *Cathey* instructed the jurors that they could consider Cathey's flight in determining guilt or innocence. 241 Kan. at 729-30. What defendant directs the court's attention to in *Cathey* is what was wrong with the instruction on flight—"Such an instruction singles out and particularly emphasizes the weight to be given to that evidence by the jury." 241 Kan. at 731. Williams' point seems to be that the trial court's response to the inquiry about premeditation singled out and emphasized the weight of the State's evidence of premeditation, and, by the same token, de-emphasized the weight of his evidence of mental defect. The analogy is faulty in that a response to an inquiry, unlike an instruction, is formulated in response to a particular inquiry. A trial court's task in responding to an inquiry is to provide guidance with regard to the subject of the inquiry. If the subject of the inquiry involves primarily the evidence of one party, the trial court may be hard pressed, in drafting a helpful response, to avoid singling out and emphasizing the weight of any party's evidence. In this case, the subject of the inquiry was premeditation, and the trial court appropriately gave a response that was formulated to help the jury understand premeditation. If defendant wanted the trial court to remind the jury of the mental defect or disease defense, a request could have been made to include the mental defect instruction, Instruction 22, among those the trial court asked the jury to reread. There was, however, no request to include Instruction 22 in the response. The trial court did not abuse its discretion.

Williams next argues that the trial court abused its discretion in determining that the State's peremptory strikes were constitutionally permissible.

Under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712(1986), whether a prima facie showing of a racially based strike of a potential juror has been made is a question of law subject to plenary review. The district court's decision about whether the State acted with discriminatory purpose, however, is subject to an

abuse of discretion standard of review. *State v. Douglas*, 274 Kan. 96, Syl. ¶ 1, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003).

Defendant's principal contention is that the reasons given by the State for striking minority veniremen Crawford, Carey, and Anderson are not supported by the record. Even though conceding that the prosecutor's explanation need not be persuasive nor even plausible, *State v. Sanders*, 263 Kan. 317, Syl. ¶ 8, 949 P.2d 1084 (1997), defendant contends that the stated reasons must be consistent with the facts. Defendant cites *McClain v. Prunty*, 217 F.3d 1209, 1222 (9th Cir. 2000), in which the stated reasons for striking veniremen were directly contradicted by the record. Because defense counsel made no objection to the prosecuting attorney's stated reasons, this court must accept them as true. *State v. Washington*, 275 Kan. 644, Syl. ¶ 3, 68 P.3d 134 (2003). In the present case, comparison of the State's reasons and the answers given by the veniremen reveal consistency rather than contradiction.

The prosecuting attorney gave the following reason for striking Crawford:

"My reason for striking Mr. Freeman Crawford is because he indicates he's a counselor and he spent so many years as a counselor. This testimony might come down to mental state and the testimony of a psychologist. He indicated that while he didn't do those kind of tests, but he sat in on the many staffings of kids, so I struck him for that reason, his expertise in that area."

Defendant contends that the record shows that Mr. Crawford had no expertise in psychology. During voir dire, the prosecuting attorney asked, "Does anybody have any strong background or concentrated areas of education in the areas of mental health psychology, things of that nature?" Crawford raised his hand. He said that his experience was "[c]ounseling for about 20 years, teaching and counseling for about 20 years." He is employed as a school counselor and has been assigned to Northeast Junior High School and Central Middle School. Crawford said that he did not administer intelligence tests, but that he "sat in on a lot of screening and things for placement of students who had." The reason given by the prosecuting attorney is reflected in the record.

The prosecuting attorney gave the following reasons for striking Carey:

"No. 6 is Mr. Carey. He indicated that he had—that he had a son that was charged in California with drugs and that he thought that he was treated fairly. He really didn't know much about it at all, so I struck him for two reasons and one is that it seems to me if after you[r] child is charged with something, you know you would know something about it, but he acted like he didn't know anything about it at all and No. 2, because the fact that he had a relative charged. I went through and I tried to make sure I got everybody that had a relative charged in that first 38 and actually in the first 40 something."

Defendant argues that the record does not support the reasons given by the prosecuting attorney. Defendant, however, does not deny that the record shows that Carey was uninformed about his son's prosecution. He only contends that it was reasonable for Carey to be uninformed about his son's criminal charges. Moreover, the prosecuting attorney indicated that he would have stricken Carey simply on the ground that Carey had a relative who had been charged with a crime.

The prosecuting attorney gave the following reasons for striking Anderson:

"No. 16, judge, is Melvie Anderson. I asked about relationships and who knew each other. I did not want two people on the panel on the jury knowing another person on the jury and I had Mrs. Anderson knowing No. 13, Eudora Douglas, which is the minority that I did not strike. I thought I needed to strike one of the two of them. The reason I struck that one instead of Eudora Douglas was because she spent a lot of years in the school system working as a cook with kids of this age that the defendant is, so I struck her instead of the other one. Also, on her form she doesn't list any job whatsoever. I think she leaves it completely—I think she had trouble with maybe some instructions or directions. If you look at the form she shows present employer, no. Work duties, no. Length of time with present employer, no. 'If less than five years or retired, state previous employer. No.' And she clearly stated on the record that she worked as a cook for a lot of years, that's how she knew No. 13, so I chose her instead of the other lady because I thought maybe this one had a little bit more difficult time following directions."

Defendant contends that Anderson's knowing Eudora Douglas was not a good reason for striking Anderson because the State did not strike other veniremen who were acquainted with people involved in the trial. What the prosecuting attorney said was he did not want people on the jury who knew each other. The veniremen cited by defendant were acquainted with a witness and with the prosecuting attorney, not with other veniremen.

No abuse of the trial court's discretion has been shown.

Next, Williams argues that it was error for the trial court to refuse to instruct the jury that mental disease or defect could be a defense to the crime of aggravated burglary.

The jury was instructed that in order to establish the charge of aggravated burglary, the State was required to prove:

"1. That the defendant *knowingly entered into a building*, to-wit: 2200 N. 44th Street, Kansas City, Kansas, which is a dwelling;

"2. That the defendant did so without authority;

"3. That the defendant did so *with the intent to commit a felony*, to-wit: aggravated robbery, therein;

"4. That at the time there was a human being, to-wit; Wilbur and/or Wilma Williams, in the dwelling; and

"5. That this act occurred on or about the 3rd day of August, 1999, in Wyandotte County, Kansas." (Emphasis added.)

Defense counsel asked for an instruction regarding intent and mental defect as it affects the charge of aggravated burglary. The trial court denied the request: "The aggravated burglary charge I'm going to deny your request because I don't think there is an issue in the evidence that supports your contention that he didn't have specific intent for that particular crime based upon his own testimony and the testimony of the State, so that will be denied."

In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of the trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. *State v. Gholston*, 272 Kan. 601, 615, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002).

On appeal, defendant does not address his own testimony or that of the State's witnesses but asserts that Dr. Roosa's testimony supported an instruction that the defense of mental disease or defect was applicable to the aggravated burglary charge. In his brief, defendant asserts that Roosa testified that defendant had a mental defect that limited his capacity to think things through, "leaving him only able to form general intent, or intent at the moment." Roosa, however, did not testify that Williams could only form gen-

eral intent. Roosa's core conclusion is that the defendant's mental defect hindered his ability to understand the consequences of his actions. At the pages cited by defendant in support of his position, Roosa was asked and answered as follows:

"A. I don't see any evidence of any skillfullness of premeditation and if there is a thought about something, if a situation comes up what we all do we have a thought about something, we have some idea of what we are going to do, but then as the reality hits, as we get closer to, we begin to make adjustments and that ability to make those adjustments, that ability to talk to the left side of the brain is seriously deficient.

"Q. You're talking about Ronell is deficient—

"A. Yes.

"Q. —in forming an intent, is that what you said, in forming an intent then?

"A. You can have a meaningful intent. You can have a thought at the moment, but he has those thoughts, but then the reality of the situation doesn't strike him and, therefore, it inhibits and reduces the effectiveness of modulating of what might be the original thoughts."

Dr. Roosa's testimony supports the trial judge's decision not to give a mental defect or disease instruction in conjunction with the aggravated burglary instruction. Moreover, although denying that he intended to kill Mr. and Mrs. Williams when he went into their house, defendant testified that he "was just going down there to rob them." Even viewed in the light most favorable to defendant, neither his testimony nor Roosa's testimony supports his request for a mental defect instruction in conjunction with the aggravated burglary instruction.

Williams argues that the hard 50 sentencing scheme violates the Sixth and Fourteenth Amendments to the United States Constitution and the rule of *Apprendi*.

Although noting that the court rejected this argument in *State v. Boldridge*, 274 Kan. 795, 57 P.3d 8 (2002), defendant reargues it in order to preserve the issue for federal review. Since *Boldridge* was decided, the court has reiterated its ruling that *Apprendi* is not violated by a hard 50 sentence in *Washington*, 275 Kan. at 680. Williams' argument has no merit.

Finally, Williams argues that cumulative trial errors deprived him of a fair trial.

Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Humphery*, 267 Kan. 45, Syl. ¶ 10, 978 P.2d 264 (1999). Since we find there are no errors to accumulate in this case, Williams' argument fails.

Affirmed.