No. 99,110

STATE OF KANSAS, *Appellee*, v. ANDREW RAMEY ELLMAKER, *Appellant*.

(221 P.3d 1105)

Opinion filed December 4, 2009.

*Carl Folsom, III*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Andrew Ramey Ellmaker, a juvenile who was certified to stand trial as an adult, appeals his convictions of premeditated first-degree murder and aggravated battery. He also appeals his sentence of life imprisonment without parole for 50 years. He raises several issues that we have taken the liberty to rephrase to

reflect the parties' arguments and to reorder for ease of discussion: (1) Did the district court err by giving an instruction regarding the definition of criminal intent as it related to premeditated first-degree murder? (2) Did the district court err by giving an *Allen*-type instruction to the jury (see *Allen v. United States*, 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154 [1896])? (3) Where a juvenile stipulates to the evidence regarding a waiver of juvenile jurisdiction, can an appellate court under K.S.A. 38-1681 consider whether the district court erred in authorizing the prosecution of the defendant as an adult without first submitting to a jury the question of whether the facts supported the court's certification decision? (4) Where a juvenile stipulates to the evidence regarding a waiver of juvenile jurisdiction, can an appellate court consider whether the district court erred in certifying the defendant for prosecution as an adult without complying with K.S.A. 38-1636(c)(2), the statute in effect at the time of the offenses and certification? (5) Were the defendant's due process rights violated because the criminal complaint did not specify the underlying aggravating factors supporting a hard 50 life sentence? (6) Is Kansas' hard 50 sentencing scheme unconstitutional? and (7) Did cumulative errors deprive the defendant of a fair trial?

We reject most of Ellmaker's arguments, finding merit only in his contention that the *Allen*-type instruction was erroneous. That error, however, was not reversible, and we therefore affirm Ellmaker's convictions and his hard 50 life sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

Ellmaker's convictions arise from the murder of his social worker, Teri Zenner, and the aggravated battery of his mother, Mary Susan Ellmaker (Sue). When the crimes occurred in August 2004, Ellmaker was 17 years old and a senior in high school. He had a long history of mental "dysfunction," dating back to his early childhood. Ellmaker had been diagnosed with having schizotypal personality, which is a personality trait containing some elements of schizophrenia. As part of his treatment regimen, Ellmaker was assigned a social worker through the Johnson County Mental Health Center, and Zenner had served in that role for about a year.

On the day of the crime, Zenner came to Ellmaker's home for an after-school visit. Initially, Ellmaker and Zenner were the only ones in the home. Consequently, most of what the jury learned about the events came from Ellmaker's statements to police. These statements were made several hours after the crimes were committed and after Ellmaker waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). Recordings of the police interviews were played to the jury.

According to Ellmaker, when Zenner arrived she indicated the meeting would be short. She quickly completed some paper work for Ellmaker to sign and then prepared to leave. But Ellmaker did not want her to leave, and he asked her to go upstairs to his bedroom. Ellmaker told the detective he had a reason for not allowing Zenner to leave, but he did not want to say what it was. Eventually Ellmaker "convinced" Zenner to go to his bedroom.

Once there, Ellmaker pulled out his sharpest knife, which he described as a sharpened chef's knife. Zenner told him she was scared, needed air, and wanted to leave. She told Ellmaker that she would not report the incident, but he told the detective, "I knew she was going to go to the police about me holding her at knife point in my room so I did it."

According to Ellmaker, he "did it" when his mother Sue came home earlier than he expected, approximately 30 minutes after Ellmaker and Zenner had gone into his bedroom. He explained that Zenner was crying loudly when he heard his mother come into the house. Sue testified, however, that she did not hear the crying when she first entered the house. But, after just a few minutes, she went back to her car briefly, reentered the house, and at that point heard Zenner crying. Sue yelled for her son to come downstairs. When nothing happened, Sue persisted, telling Ellmaker numerous times that she wanted both of them to come down. At one point, Sue threatened to call the police, and Ellmaker replied, "When?" Giving Ellmaker until the count of three to come downstairs, Sue began counting down, "Three, two, one."

When Sue got to "one," Zenner sprang for the door. As she did, Ellmaker stabbed her in the throat. Ellmaker told the detective he

"just didn't care." Despite the wound, Zenner escaped; she came running out of the bedroom and down the stairs. Ellmaker followed and continued stabbing her. He explained that "one [stab] came" and "then all the others had to come."

When Ellmaker and Zenner got to the bottom of the stairs, Sue placed herself between Zenner and Ellmaker, yelling for Ellmaker to stop. All three tumbled to the floor, and Sue rolled onto Zenner to protect her. Ellmaker stabbed Sue four times in the back, once in the chest, and once in the right arm; he also slashed her ear. Ellmaker stopped stabbing at them when the knife bent.

At that point, Sue ran next door to get help and call 911. Meanwhile, Ellmaker returned to his bedroom, turned on some music, and grabbed his chainsaw from the closet. He explained to the detective that he followed the instructions printed on the chainsaw's box that detailed seven steps for starting and operating the chainsaw. Ellmaker then used the chainsaw to almost sever Zenner's left forearm and her neck. He also slashed her head, back, and right hip. At this point, the chain broke which, according to Ellmaker, caused him to be "pissed off" because he had recently bought the chainsaw.

After using the chainsaw, Ellmaker tried to commit suicide by ingesting a variety of pills. He then left the house with two pellet guns and tried to leave in Zenner's vehicle. When he had trouble getting the car to start, he took gasoline from the garage, poured it on the vehicle, and set it on fire. Ellmaker ran into the street as police arrived. The police ordered him to drop his weapons, which he did. As Ellmaker was being handcuffed, he spontaneously stated, "I just killed my therapist with a chainsaw," and "I cut her down the back, on the arm, [and] I cut her leg off. I don't know if I cut her head off or not."

Because Ellmaker had cut one of his fingers, officers sent him by ambulance to the emergency room at a local hospital where an emergency room physician stitched the finger. The physician testified that he asked Ellmaker how he injured his finger, and Ellmaker replied he was not exactly sure how it happened. Ellmaker reported that he had stabbed his social worker in the neck and then chased her down the hall, stabbing her. He also reported that

they fell down the stairs, that he had stabbed his mother, and that at some time during these events he cut his finger. Ellmaker told the physician that after the stabbings stopped, he turned and saw Zenner on the floor and "knew what he had to do." He then "went to get his chainsaw."

Still at the hospital, Ellmaker was interrogated by Sergeant Russell Stamer. After being *Mirandized* and signing the waiver, Ellmaker agreed to speak to Stamer. Because of the circumstances at the hospital, Stamer conducted two interviews over the course of approximately 2 hours. These are the recorded interviews that were played for the jury.

In addition, as part of the investigation, the police executed a search warrant and the coroner performed an autopsy. In executing the search warrant, the police found several knives, a hatchet, an ax, two machetes, and four small ropes in Ellmaker's bedroom. Some of these items were hidden from view, but others, including the ax, were clearly visible. The autopsy revealed Zenner suffered six stab wounds, several of which would have been fatal or potentially fatal. According to the coroner, the likely cause of death was a compound stab wound to the throat. One pathway was 4 inches deep and went through the pulmonary artery, the right chamber of the heart, and the aorta. After suffering this stabbing, Zenner had only seconds to live. In addition, the coroner documented stab wounds to both lungs that were potentially fatal and other nonfatal wounds to her hand and thigh. Most likely, Zenner was dead before Ellmaker used the chainsaw, which inflicted injuries that would otherwise have caused death, including near decapitation.

Ellmaker was charged in juvenile court with premeditated first-degree murder and aggravated battery. As will be discussed in more detail, based in part on a defense stipulation, the district court waived juvenile jurisdiction. At trial, after Ellmaker was certified for prosecution as an adult, defense counsel conceded that Ellmaker's killing of Zenner was intentional, but he argued that it was not premeditated. The jury convicted Ellmaker as charged. He now brings a timely appeal.

## I. JURY INSTRUCTION ON CRIMINAL INTENT

As his first issue on appeal, Ellmaker claims the district court

erred in instructing the jury with Pattern Instructions for Kansas (PIK) Crim. 3d 54.01 (inference of intent), over defense counsel's objection. PIK Crim. 3d 54.01 was used by the district court as the basis for Instruction 10, which states:

"Ordinarily, *a person intends all of the usual consequences of his voluntary acts*. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant." (Emphasis added.)

Ellmaker's objection is two-pronged, as he contends the presumption contained within the instruction impermissibly lowered the State's burden to prove the specific intent and premeditation elements of the premeditated first-degree murder count.

## A. *Standard of Review*

The parties disagree on the standard of review to be applied to our analysis of this issue. The standard of review for criminal jury instructions is primarily defined by K.S.A. 22-3414(3), which states in part:

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict *stating distinctly the matter to which the party objects and the grounds of the objection* unless the instruction or the failure to give an instruction is clearly erroneous." (Emphasis added.)

Thus, the standard of review depends on whether a party states a specific objection to the giving of an instruction. Here, Ellmaker's counsel objected to Instruction 10. Nevertheless, the State argues a clearly erroneous standard of review applies because Ellmaker stated a different objection at trial than the issue he raises on appeal. In other words, using the terminology of the statute, Ellmaker did not "distinctly" state "the grounds of the objection" that he advances on appeal.

The record substantiates the State's argument. In fact, PIK Crim. 3d 54.01 or a similar instruction was proposed by both parties in pretrial filings. Nevertheless, at the instructions conference, defense counsel argued that giving Instruction 10 would be "inappropriate" and objected to the inclusion of the instruction based

on the premise that the instruction constituted "burden shifting." Despite the objection, the district court decided to give the instruction in light of this court's repeated rejection of the burden-shifting argument and past approval of PIK Crim. 3d 54.01. See, *e.g.*, *State v. Martinez*, 288 Kan. 443, 452, 204 P.3d 601 (2009); *State v. Woods*, 222 Kan. 179, 185-86, 563 P.2d 1061 (1977).

On appeal, rather than make the burden-shifting argument asserted at trial, Ellmaker argues the instruction lowered and even negated the State's burden. At oral argument, Ellmaker's appellate counsel attempted to minimize the difference between the objections, arguing the effect of both arguments was essentially the same and the two objections were functionally equivalent.

We disagree. While the focus is on the State's burden of proof, the concepts and legal principles that relate to the argument of whether a burden is shifted to a defendant are different than those that relate to defining and imposing the State's burden of proof in a criminal case. Further, it is important to remember that the purpose of requiring an objection is to allow the district court to correct an error, if one occurred. *E.g.*, *State v. Crane*, 260 Kan. 208, 218, 918 P.2d 1256 (1996). Here, the district court considered authorities related to the specific objection raised by Ellmaker during the instruction conference, but the district court had no opportunity to consider the argument now being made. Under similar circumstances where a trial objection to a jury instruction was different from the appellate issue, this court has applied the clearly erroneous standard of review. See, *e.g.*, *State v. Butler*, 257 Kan. 1043, 1065, 897 P.2d 1007 (1995). For these reasons and based on these authorities, we conclude the clearly erroneous standard of review applies to this issue.

The clearly erroneous standard of review under K.S.A. 22-3414(3) is well known: "An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *Martinez*, 288 Kan. 443, Syl. ¶ 9; see *State v. Salts*, 288 Kan. 263, 265-66, 200 P.3d 464 (2009); *State v. Overstreet*, 288 Kan. 1, 9-10, 200 P.3d 427 (2009). In reviewing jury instructions for error, we examine the instructions as a whole,

rather than isolate any one instruction, and determine if the instructions properly and fairly state the law as applied to the facts of the case. See *State v. Dixon*, 289 Kan. 46, 67, 209 P.3d 675 (2009); *State v. Edgar*, 281 Kan. 47, 54, 127 P.3d 1016 (2006).

## B. Specific Intent

Applying this standard of review, we examine the first prong of Ellmaker's argument, *i.e.*, that Instruction 10 "eroded" the specific intent element by allowing the State to prove merely that he committed the voluntary act of stabbing Zenner's throat. He argues that once the State proved he had stabbed Zenner, the jury could conclude he intended to kill her because death is a natural consequence of stabbing someone in the throat. The result, he asserts, is that the State was relieved of its burden of proving intent beyond a reasonable doubt. We do not reach the substance of this issue, however, because Ellmaker's own arguments to the jury and his requests for jury instructions undercut his argument.

The most significant undercutting of Ellmaker's instruction argument results from the defense's trial concession that Ellmaker intended to kill Zenner. For instance, during closing arguments, defense counsel told the jury that Ellmaker "struck down with the knife intentionally and purposefully with intent to kill." He also argued that Ellmaker committed an intentional act, which was an "instantaneous reaction." In addition, defense counsel argued that the jury should convict Ellmaker of the lesser offense of *intentional* second-degree murder rather than first-degree murder because of the lack of premeditation. Hence, premeditation, or the lack thereof, was the focus of Ellmaker's theory of defense, and Ellmaker's intent to kill was not a disputed issue as evidenced by his own arguments.

Ellmaker's argument is also undercut because, if there was confusion regarding intent, it was at least partially created by Ellmaker's request to give PIK Crim. 3d 54.01-A, the instruction on general intent. This instruction was requested by Ellmaker during the instruction conference after the district court mentioned the instruction but immediately questioned whether giving it would be appropriate. In response, the State indicated it did not "have any

problem with it," and defense counsel responded, "I request it." On appeal, Ellmaker defends the use of the instruction because it provides a definition of intent that is consistent with K.S.A. 21-3201, which states, in part: "(b) Intentional conduct is conduct that is purposeful and willful and not accidental. As used in this code, the terms 'knowing,' 'willful,' 'purposeful,' and 'on purpose' are included within the term 'intentional.' "

PIK Crim. 3d 54.01-A does not end with this definition, however. It also states: "Intent or lack of intent is to be determined or inferred from all the evidence in the case." Thus, though a more general statement than PIK Crim. 3d 54.01, PIK Crim. 3d 54.01-A reiterates the direction in PIK Crim. 3d 54.01 that the State's burden can be met through inferences drawn from a defendant's actions. What is troubling about the instruction is what it does not state; specifically, it does not indicate the specific intent that must be established to prove the elements of the charged crimes or various lesser included offenses. See *State v. Bruce*, 255 Kan. 388, 394, 874 P.2d 1165 (1994) (" 'The distinction between a general intent crime and a crime of specific intent is whether, in addition to the intent required by K.S.A. 21-3201, the statute defining the crime in question identifies or requires a further particular intent which must accompany the prohibited acts.' ").

Because PIK Crim. 3d 54.01-A blurs general and specific intent, there is a long line of precedent in which it has been repeatedly held that PIK Crim. 3d 54.01-A should not be used as a separate instruction in a case where specific intent must be proven. *E.g., State v. Yardley*, 267 Kan. 37, 42-43, 978 P.2d 886 (1999); *State v. Mitchell*, 262 Kan. 434, 442-43, 939 P.2d 879 (1997); *State v. Isley*, 262 Kan. 281, 293, 936 P.2d 275 (1997); *State v. Plunkett*, 261 Kan. 1024, 1032, 934 P.2d 113 (1997). The same point is emphasized in the Notes on Use for PIK Crim. 3d 54.01-A, which state:

"This instruction [PIK Crim. 3d 54.01-A] is not recommended for general use. The PIK instruction defining the crime should cover either specific or general criminal intent as an element of the crime. *This instruction should be used only where the crime requires only a general criminal intent and the state of mind of the defendant is a substantial issue in the case.*" (Emphasis added.)

First-degree murder is a specific intent crime, and the instruction should not have been given. See *State v. Trussell*, 289 Kan. 499, 503, 213 P.3d 1052 (2009) (State required to prove specific intent to kill and premeditation to convict of first-degree murder).

Despite this guidance and precedent, Ellmaker requested PIK Crim. 3d 54.01-A. A party cannot allege error arising from an instruction that the party requested. See K.S.A. 22-3414(3). It follows that a party who injects error by requesting an erroneous instruction cannot complain that a different instruction causes the same error. Here we have a situation where the erroneous, requested instruction (PIK Crim. 3d 54.01-A) blurs the requirement of specific intent and potentially confused the jury as to what intent must be established. The complained-of instruction (PIK Crim. 3d 54.01) is claimed to have done the same thing. Under those circumstances, Ellmaker cannot complain of the alleged error.

## C. Premeditation

In the second prong of this issue, Ellmaker argues Instruction 10 could have led the jury to believe that only the voluntary act of stabbing had to be thought over beforehand, not the killing. We disagree because the instructions clearly advised that the intent to kill and premeditation were separate elements and that the State was required to prove both. To explain, several instructions need to be considered.

First, Instruction 15 stated the elements of premeditated first-degree murder. This instruction, which was modeled after PIK Crim. 3d 56.01, stated:

"The defendant is charged in Count I of the Complaint with the crime of murder in the first degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That the defendant intentionally killed Teri Zenner;

2. That such killing was done with premeditation;

3. That this act occurred on or about the 17th day of August, 2004, in Johnson County, Kansas."

As previously noted, Ellmaker's counsel conceded element 1—that Ellmaker intentionally killed Zenner. Element 2 stated the premeditation requirement and clearly required that the *killing* be

premeditated. Thus, contrary to Ellmaker's argument, the instruction left no room for the jury to conclude that only the stabbing had to be premeditated.

Another instruction—Instruction 16—provided the jury the definition of "premeditation." Instruction 16, which was identical to PIK Crim. 3d 56.04, reiterated that the killing had to be premeditated and stated:

" 'Premeditation' means to have thought the matter over beforehand, in other words, to have formed the design or intent *to kill* before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of *taking another's life.*" (Emphasis added.)

In addition, Instruction 7, which followed PIK Crim. 3d 52.02, clearly informed the jury of the State's burden to prove every element. Furthermore, Instruction 10 did not alter the other instructions' guidance on the State's burden of proof. As explained in the PIK committee's Notes on Use for PIK Crim. 3d 54.01 (on which Instruction 10 is based), the inference of intent instruction "is a rule of evidence and does not deal with the required element of criminal intent necessary for conviction in those cases where criminal intent is a necessary element of the offense"; see also PIK Crim. 3d 54.01-A, Notes on Use (PIK Crim. 3d 54.01-A "must not be confused with" PIK Crim. 3d 54.01 "which is a rule of evidence and does not purport to charge the jury to find criminal intent necessary for conviction."); *State v. Lassley*, 218 Kan. 752, 756, 545 P.2d 379 (1976) (stating that the inference of intent instruction pertains to the presumption of intent which is merely a rule of evidence). Moreover, the "instruction is designed to make it crystal clear that the 'presumption' is only a permissive inference, leaving the trier of fact free to consider or reject it." PIK Crim. 3d 54.01, Comment. In fact, Instruction 10 emphasized: "You may accept or reject [the inference] in determining whether the State has met its burden to prove the required criminal intent of the defendant."

Based on this reasoning, this court has consistently approved PIK Crim. 3d 54.01. *E.g., Martinez*, 288 Kan. at 452; *State v. Stone*, 253 Kan. 105, Syl. ¶ 1, 853 P.2d 662 (1993); *State v. Harkness*, 252 Kan. 510, 525-27, 847 P.2d 1191(1993); *State v. McDaniel &*

*Owens*, 228 Kan. 172, 179-80, 612 P.2d 1231 (1980); *State v. Lass-ley*, 218 Kan. 758, 762, 545 P.2d 383 (1976). Although these cases primarily dealt with an issue of shifting burdens, the decisions also often contained statements relating to Ellmaker's argument.

For example, in *Lassley*, the court contrasted presumptions with inferences and explained that an instruction allowing the jury to infer intent

"is consistent with the requirement that the prosecution prove the criminal intent. Intent is difficult, if not impossible, to show by definite and substantive proof. Thus, it is agreed that criminal intent may be shown by proof of the acts and conduct of the accused, and inferences reasonably drawn therefrom. We fail to see any conflict with the statutory burden placed on the state." *Lassley*, 218 Kan. at 762-63.

Subsequently, in *Harkness*, this court explained that " 'an instruction containing a permissive inference does not relieve the State of its burden because it still requires the State to convince the jury that an element, such as intent, should be inferred based on the facts proved.' [Citation omitted.]" *Harkness*, 252 Kan. at 526; see *Stone*, 253 Kan. at 106-08. Most recently, in a premeditated first-degree murder case, this court rejected the defendant's argument that PIK Crim. 3d 54.01 "allows the jury to disregard the State's burden of proving intent." *Martinez*, 288 Kan. at 452.

This repeated rejection of Ellmaker's argument reaffirms the propriety of the instructions in this case. Considering all the instructions together, we conclude Instruction 10 did not mislead the jury into believing that the State did not have to prove that Ellmaker premeditated the killing and could meet its burden by proving that Ellmaker premeditated the stabbing.

## II. *ALLEN*-TYPE INSTRUCTION

Next, Ellmaker challenges the language stating that "[a]nother trial would be a burden on both sides," found in Instruction 14, an *Allen*-type instruction, which mirrored PIK Crim. 3d 68.12. See *Allen v. United States*, 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154 (1896). He contends on appeal that Instruction 14 impermissibly pressured jurors to reach a unanimous verdict. In addition, he argues that this language is misleading and inaccurate because an-

other trial is not a burden to either party. Ellmaker contends, as well, that the disputed language prejudiced him because it appealed to the jurors' financial interests as taxpayers. We agree and conclude the district court erred in giving the deadlocked jury instruction. Nevertheless, we also conclude the district court's decision was not reversible error.

Ellmaker did not object to the instruction at trial; therefore, as with the previous issue, the clearly erroneous standard of review applies. The language which Ellmaker argues is clearly erroneous is emphasized in the following quotation of Instruction 14:

"Like all cases, this one is important. If you fail to reach a decision on some or all of the charges, that charge or charges are left undecided for the time being. It is then up to the State to decide whether to resubmit the undecided charges to a different jury at a later time. *Another trial would be a burden on both sides.*

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of the other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve the differences and come to a common conclusion.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary." (Emphasis added.)

The giving of the deadlocked jury instruction before the jury retires for deliberations has previously been approved, see *State v. Makthepharak*, 276 Kan. 563, 569, 78 P.3d 412 (2003), and reaffirmed in *State v. Anthony*, 282 Kan. 201, 216, 145 P.3d 1 (2006). But this court recently announced in *Salts*, 288 Kan. 263, Syl. ¶ 2, that it is error to include the last sentence in the first paragraph of the instruction: "Another trial would be a burden on both sides." There, for the first time on appeal, Salts challenged the deadlocked jury instruction, arguing the language was misleading and inaccurate because another trial does not burden either party; it is the State's obligation and a defendant's right. Salts further argued the language was legally incorrect because, as noted in a previous jury instruction, the jury should not consider what happens after trial.

Finally, Salts argued the disputed language prejudiced him because it appealed to the jurors' financial interests as taxpayers.

In holding that the challenged language was misleading and inaccurate, the *Salts* court stated:

"Contrary to this language, a second trial may be burdensome to some but not all on either side of a criminal case. Moreover, the language is confusing. It sends conflicting signals when read alongside . . . [an] instruction that tells jurors not to concern themselves with what happens after they arrive at a verdict.

"We therefore hold that including the language '[a]nother trial would be a burden on both sides' in PIK Crim. 3d 68.12 is error." *Salts*, 288 Kan. at 266.

Nevertheless, convinced there was no real possibility of the jury rendering a different verdict if the error had not occurred, we concluded there was no reversible error, even if the instruction included an erroneous statement. *Salts*, 288 Kan. at 267. The deadlocked jury instruction in *Salts*, as in the present case, was given before the jury deliberated and was included with all the other jury instructions.

Similar to *Salts*, we are firmly convinced that there is no real possibility that the jury would have rendered different verdicts if the error had not occurred. The evidence against Ellmaker was substantial. There is no question that he was guilty of serious crimes against both Zenner and Sue. As to the count of premeditated first-degree murder, the defense conceded the intent to kill. Further, there was considerable evidence of premeditation, including Ellmaker's gathering of weapons, his apparent plan to hold Zenner against her will, and his statements that "I knew she was going to go to the police about me holding her at knife point in my room so I did it." Then, without knowing Zenner was probably already dead, when she fell to the floor, he "knew what [he] had to do," meaning he had to get his chainsaw and use it on Zenner. This process included him going to his bedroom, getting the chainsaw, following the seven steps to start the chainsaw, and then using it. Regarding the count of aggravated battery, the evidence was undisputed that Ellmaker stabbed his mother multiple times resulting in injuries that required medical treatment. In light of this evidence, we do not hesitate in finding that the district court's

giving the *Allen*-type instruction does not require reversal of either conviction.

## III. PROSECUTION AS ADULT WITHOUT JURY DETERMINATION

Next, Ellmaker argues that when the juvenile judge made factual findings supporting its decision to authorize the prosecution of him as an adult, it increased his potential punishment in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

As part of its response to these arguments, the State raises the preliminary question of whether we have jurisdiction to consider this *Apprendi* issue because Ellmaker consented to the order authorizing his prosecution as an adult. Appellate courts have unlimited review over questions involving the existence of jurisdiction. See *State v. Fischer*, 288 Kan. 470, 472, 203 P.3d 1269 (2009) (stating that constitutional challenges present a question of law subject to unlimited review); *State v. Denney*, 283 Kan. 781, 787, 156 P.3d 1275 (2007) (stating that jurisdiction is a question of law subject to unlimited review).

### A. Additional Facts

Initially, charges were brought against Ellmaker as a juvenile under the Kansas Juvenile Justice Code, K.S.A. 38-1601 *et seq.*, alleging he committed two person felony offenses—premeditated first-degree murder, an off-grid crime, and aggravated battery, a nondrug severity level 4 crime. See K.S.A. 21-3401(a); K.S.A. 21-3414. Based in part on the severity of these crimes, the State filed a motion requesting a "waiver to adult status" under K.S.A. 38-1636 in order to prosecute Ellmaker as an adult under the Kansas Criminal Code, K.S.A. 21-3101 *et seq*. At the hearing on the matter, defense counsel stated the following on the record:

"We have had [Ellmaker] examined by three doctors, actually four [*sic*]—two Ph.D. psychologists, and a psychiatrist. They all unanimously concur that he is severely ill, mentally ill, and needs long-term structured treatment such that jurisdiction of this court would be exceeded by his needs.

"And I have gone over the factors that the court is to consider under K.S.A. 38-1636 with [Ellmaker] in quite some detail, and he has concluded along with us that at this point in time, he will stipulate to the waiver and stipulate that the

court should waive its original jurisdiction and that the proceedings continue in the adult court."

Before accepting Ellmaker's stipulation, the judge presiding over the juvenile proceeding, asked Ellmaker if he had enough time to think about this decision and to discuss it with defense counsel. Ellmaker said, "Yes, I have." Ellmaker indicated that he was taking prescribed medications, but they did not interfere with his ability to think clearly at the hearing. Ellmaker denied having been threatened to make the stipulation or having been given any promises. When the judge asked Ellmaker if it was his desire to "waive your right to a hearing and be prosecuted as an adult," he answered in the affirmative. The judge also considered the eight factors in K.S.A. 38-1636(e) that a court must consider in determining whether prosecution as an adult should be authorized—*i.e.*, seriousness of the offense; whether the offense was committed in an aggressive, violent, premeditated, or willful manner; whether the offense was against a person or property; the number of alleged offenses unadjudicated and pending; the juvenile's previous history; the sophistication or maturity of the juvenile; the availability of facilities or programs likely to provide rehabilitation; and whether the interests of the juvenile or community would be better served by adult prosecution or extended juvenile jurisdiction.

## B. Jurisdiction

"It is well established that appellate jurisdiction is defined by statute; the right to appeal is neither a vested nor constitutional right. . . . [A]ppellate courts do not have discretionary power to entertain appeals from all district court orders. [Citations omitted.]" *Williams v. Lawton*, 288 Kan. 768, 778, 207 P.3d 1027 (2009). Applying this rule in this case, the State argues that the relevant statutes do not grant appellate jurisdiction over a decision to certify a juvenile as an adult if the juvenile consents to adult jurisdiction. To support the argument, the State relies on K.S.A. 38-1681(a)(1) (repealed effective January 1, 2007; L. 2006, ch. 169, sec. 140), which was applicable at the time of the hearing in this case and stated in part: "Unless the respondent [juvenile offender] has consented to the order, an appeal may be taken by a respondent

from an order authorizing prosecution as an adult." See K.S.A. 2008 Supp. 38-2380(a)(1) (current version containing nearly identical language); K.S.A. 22-3208(4) (stating that "consent to trial upon a complaint . . . shall constitute a waiver of defenses and objections based upon the institution of the prosecution").

A similar argument was considered in *State v. Smith*, 268 Kan. 222, 993 P.2d 1213 (1999). In *Smith*, one of the defendants, a juvenile, had requested to be tried as an adult, but he argued on appeal that the court improperly waived jurisdiction by failing to consider the statutory factors enumerated in K.S.A. 38-1636(e). In response, the State argued that the juvenile judge's order authorizing prosecution as an adult was not appealable because the juvenile defendant had consented to the order. Under the facts of that case, this court disagreed because the statute provides that "the judge, in making the decision to waive jurisdiction, must take into account the juvenile's stipulation and evidence concerning the eight factors in K.S.A. 38-1636(e)." *Smith*, 268 Kan. at 246. The judge in the *Smith* case had failed to consider the eight factors.

Regarding the right to appeal, the *Smith* court stated: "While K.S.A. 38-1681 precludes an appeal of an order waiving juvenile status when the respondent [juvenile] has consented to the waiver, it does not preclude an appeal *if the judge failed to follow the statutory requirements for the waiver.*" (Emphasis added.) *Smith*, 268 Kan. at 244; *cf. In re S.M.D.*, 26 Kan. App. 2d 165, 169-70, 980 P.2d 1028, *rev. denied* 267 Kan. 889 (1999) (determining that K.S.A. 38-1636 does not require courts to consider statutory factors when a respondent stipulates that he or she cannot rebut the statutory presumption).

In this case, Ellmaker clearly consented to the order by conceding on the record that he needs longer supervision than he could receive in the juvenile justice system, a concession which was a stipulation to the State's evidence. But, unlike the situation in *Smith*, Ellmaker does not argue that the juvenile judge failed to consider the eight factors found in K.S.A. 38-1636(e). Moreover, the record shows that the judge did consider those factors in ordering Ellmaker's adult certification. Hence, under the reasoning in *Smith*, Ellmaker was properly certified for prosecution as an

adult and we do not have jurisdiction to consider Ellmaker's argument. Furthermore, the allegation of an *Apprendi*-like error does not require a different result. See *United States v. Booker*, 543 U.S. 220, 244, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005) (recognizing exception to *Apprendi* rule when defendant admits a fact or pleads guilty to an indictment that states the fact).

### IV. K.S.A. 38-1636(c)(2)

Nevertheless, in a related argument, Ellmaker contends that the juvenile judge's failure to comply with another subsection of the same statute—the notification requirements of K.S.A. 38-1636(c)(2) (repealed and Revised Kansas Juvenile Justice Code enacted effective January 1, 2007; L. 2006, ch. 169, secs. 1, 47, and 140; see K.S.A. 2008 Supp. 38-2347[c][2])—mandates that we vacate his sentences and remand his case for a resentencing under the Juvenile Justice Code. This brings into question whether the failure to advise Ellmaker of each of the rights enumerated in K.S.A. 38-1636(c)(2) creates a situation similar to that in *Smith*, 268 Kan. at 244-46, such that an appeal may be taken despite the juvenile's waiver at the hearing.

The requirements of subsection (c)(2) of K.S.A. 38-1636 are quite different from subsection (e), the provision at issue in *Smith*. K.S.A. 38-1636(c)(2) requires the judge to inform the juvenile of the following six items at the hearing on a motion to authorize adult prosecution:

"(A) The nature of the charges in the complaint;

"(B) the right of the respondent [juvenile] to be presumed innocent of each charge;

"(C) the right to trial without unnecessary delay and to confront and cross-examine witnesses appearing in support of the allegations of the complaint;

"(D) the right to subpoena witnesses;

"(E) the right of the respondent [juvenile] to testify or to decline to testify; and

"(F) the sentencing alternatives the court may select as the result of the juvenile being prosecuted under an extended jurisdiction juvenile prosecution."

The record reflects that the judge advised Ellmaker of some of these factors but did not explain the potential penalties if Ellmaker's offenses were treated as juvenile offenses.

This failure is different from the defect in *Smith*. A reading of the rights listed in K.S.A. 38-1636(c)(2) does not impact the judge's decision to certify the juvenile as an adult. In *Smith*, it was emphasized that a judge must consider the subsection (e) factors and make the required findings regardless of the juvenile's stipulation because the juvenile is not stipulating to adult jurisdiction but is stipulating "to allegations made against him in a motion to waive juvenile jurisdiction." *Smith*, 268 Kan. at 246. The distinction derives from the rule that subject matter jurisdiction cannot be conferred by waiver, estoppel, or consent. See *State v. Randolph*, 19 Kan. App. 2d 730, 737-39, 876 P.2d 177, *rev. denied* 255 Kan. 1006 (1994) (citing *State v. Mayfield*, 241 Kan. 555, 558, 561, 738 P.2d 861 [1987]). Consequently, a juvenile does not consent to jurisdiction in a literal sense. Rather, the stipulation merely means there will be no evidence presented to rebut the presumption created by K.S.A. 38-1636(a)(2) or that there is a stipulation to the evidence the State proffers. See *State v. Luna*, 271 Kan. 573, Syl. ¶ 1, 24 P.3d 125 (2001) ("A juvenile may stipulate to the State's allegations in a motion to certify the juvenile for prosecution as an adult, and, provided the allegations and/or the factual basis reviewed at the motion hearing constitute a 'rough approximation' of the eight mandatory considerations listed in K.S.A. 38-1636[e], the certification will not be overturned on appeal."). Such a stipulation is not impacted by the factors listed in K.S.A. 38-1636(c)(2).

The judge presiding over the juvenile proceeding in this case recognized the distinction, as reflected in the findings recorded in the journal entry which state that Ellmaker stipulated "to the motion and the evidence proffered" by the State. Further, the judge found Ellmaker's "need for extended structure and treatment" meant that "he cannot be adequately treated within the limitations of the juvenile code." This finding reflected the substance of Ellmaker's stipulation. Nevertheless, the judge made findings regarding other factors, citing the gravity and seriousness of the offenses and Ellmaker's age. Only then did the judge conclude "there is sufficient evidence to order [Ellmaker] to be prosecuted as an adult."

Hence, this case is distinguishable from *Smith* and is more like the situation in *State v. Williams*, 277 Kan. 338, 85 P.3d 697 (2004), which addresses the merits of Ellmaker's argument and, in doing so, indirectly discusses whether this court has jurisdiction to consider those arguments. In *Williams*, the defendant argued that the juvenile judge's failure to inform him of the items listed in K.S.A. 38-1636(c)(2) deprived the criminal court of jurisdiction to try him as an adult. Rejecting the defendant's argument, this court stated:

"Although the statute provides that the court shall inform the respondent [juvenile] of the items listed in subsection (c)(2), if the respondent is not present for the hearing, as permitted by subsection (d), the court cannot inform the respondent at the hearing of the items listed in subsection(c)(2). Hence, contrary to the defendant's contention, the fact the court did not inform the respondent of the items in subsection(c)(2) could not logically be a basis for depriving the district court of jurisdiction in the criminal prosecution." *Williams*, 277 Kan. at 347.

Explaining that there is no logical basis for depriving the criminal court of jurisdiction when the juvenile judge fails to advise the juvenile defendant of the items under K.S.A. 38-1636(c)(2), the *Williams* court further stated:

"[T]here is no statutory or case law basis for divesting the district court of jurisdiction if defendant was not advised of the items specified in K.S.A. 38-1636(c)(2). Moreover, because [juvenile] respondents need not be present for a 38-1636 hearing, there is no logical basis for divesting the district court of jurisdiction if defendant was not advised at the hearing of the subsection(c)(2) items. Some sanction may be appropriate, but *it would not include divestiture of district court jurisdiction*." (Emphasis added.) *Williams*, 277 Kan. at 348.

See *State v. Muhammad*, 237 Kan. 850, 856, 703 P.2d 835 (1985) (essentials of due process were met even though the juvenile's failure to appear at K.S.A. 38-1636 hearing was involuntary). This court affirmed Williams' convictions and sentences. See *Williams*, 277 Kan. at 348-51, 358.

For the same reasons, where there is no evidence presented but rather a stipulation to the evidence that formed the basis for the juvenile judge's findings regarding the K.S.A. 38-1636(e) factors, there is no basis to apply the *Smith* rule. Rather, under K.S.A. 38-1681, if a juvenile consents to the order authorizing prosecution as an adult, an appellate court does not have jurisdiction to consider

the issues related to the waiver proceeding or to the judicial determination to waive juvenile jurisdiction even if a district judge fails to inform a juvenile of the items listed in K.S.A. 38-1636(c)(2). Therefore, Ellmaker was properly certified for and prosecuted as an adult, and we affirm his convictions.

## V. AGGRAVATING FACTORS SUPPORTING HARD 50 SENTENCE

Next, Ellmaker complains for the first time on appeal that his due process rights were violated because, when imposing the hard 50 life sentence, the district court relied on aggravating factors that were not charged in the criminal complaint. The complaint alleged premeditated first-degree murder, an off-grid offense. Nevertheless, Ellmaker contends that because the aggravating factors were not included in the complaint, he was denied notice of the "specific crime subcategory in the crime seriousness scale" under K.S.A. 22-3201(c). At oral argument, Ellmaker emphasized he is not making a constitutional due process argument but relies on a statutory right to notice arising from K.S.A. 22-3201(c).

### A. *Jurisdiction*

Again, the State challenges whether this issue can be raised for the first time on appeal, citing to the general rule that issues not raised before the district court may not be raised on appeal. See *State v. Valladarez*, 288 Kan. 671, 675, 206 P.3d 879 (2009). Ellmaker asserts that this issue satisfies two of the exceptions to the general rule—(1) the issue involves a question of law based on admitted facts and is determinative of the case and (2) consideration of the issue is necessary to serve the ends of justice or to prevent a denial of due process rights. See *State v. Hawkins*, 285 Kan. 842, 845, 176 P.3d 174 (2008). Generally, matters of statutory interpretation are questions of law. See *State v. Ortega-Cadelan*, 287 Kan. 157, 164, 194 P.3d 1195 (2008). Further, the issue is determinative of Ellmaker's hard 50 life sentence. Consequently, we determine the first exception is satisfied and the issue may be raised for the first time on appeal.

### B. *Standard of Review*

Resolution of the issue depends on our interpretation of K.S.A.

22-3201. Our rules of statutory interpretation are well known. As we recently stated:

"When a court is called upon to interpret a statute, the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language it enacted. [Citation omitted.] For this reason, when the language of a statute is plain and unambiguous, courts need not resort to statutory construction. [Citation omitted.] If a statute is subject to more than one interpretation, however, a court attempting to discern legislative intent may employ rules of statutory construction and look to the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished, and the effects the statute may have under the various constructions suggested. [Citations omitted.]" *State v. Phillips*, 289 Kan. 28, 32, 210 P.3d 93 (2009).

## C. Analysis

K.S.A. 22-3201(c) requires that a complaint, information, or indictment "allege facts sufficient to constitute a crime or specific crime subcategory in the crime seriousness scale." Ellmaker contends the complaint in this case failed to meet this requirement because it did not allege the aggravating facts that were used as a basis to impose his hard 50 life sentence. Ellmaker argues that because aggravating facts caused the parole eligibility on his life sentence to increase from 25 years to 50 years, this constituted an increase on the "crime seriousness scale" which should have been included in the criminal complaint.

In response, the State argues that the language in K.S.A. 22-3201(c) was intended to apply to crimes characterized by varying severity levels—such as aggravated battery, which can be a severity level 4, 5, 7, or 8 person felony—depending on the manner in which the crime was committed. See K.S.A. 21-3414(b). Likewise, depending on the facts, theft can be a severity level 5, 7, or 9 nonperson felony or a class A nonperson misdemeanor under K.S.A. 21-3701(b); see also, *e.g.*, K.S.A. 21-3413(b) (classifying battery against a law enforcement officer as a class A misdemeanor, severity level 5 person felony, or severity level 7 person felony). This type of categorization is not applicable to premeditated first-degree murder, an off-grid person felony, for which a sentence of life imprisonment is imposed.

The State's arguments are valid. Our review of the Kansas statutes reveals that K.S.A. 22-3201(c) is the only statute using the term "crime seriousness scale." The term has not been defined by the legislature or an appellate court. Nevertheless, in several cases, without discussion of the term's meaning, this court has treated the phrase as the equivalent of a crime severity level. For example, in *State v. Masterson*, 261 Kan. 158, 164, 929 P.2d 127 (1996), after quoting the statute, this court stated: "Masterson should have the right to know before trial the *severity level* of the crime being charged." (Emphasis added.) Similarly, in *State v. Moody*, 282 Kan. 181, 197, 144 P.3d 612 (2006), the court applied K.S.A. 22-3201(c) and concluded that a "defendant is entitled under due process to notice in the information or complaint of the *severity level* of the . . . offense being charged." (Emphasis added.) These cases support the State's position.

Further, this court has held that imposition of a hard 50 sentence of life imprisonment without parole for 50 years, based on a fact not found by the district court as factfinder in a bench trial or by a jury in a jury trial, does not increase a defendant's maximum sentence of imprisonment for life, because the hard 50 life sentence only impacts the lower end of the sentence; thus, there is no violation of the defendant's due process rights or right to trial by jury. *State v. Boldridge*, 274 Kan. 795, Syl. ¶ 11, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003); see *State v. Conley*, 270 Kan. 18, Syl. ¶ 3, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). In other words, the hard 50 sentencing procedure is not the equivalent of exposing a defendant to an increased maximum penalty. *State v. Warledo*, 286 Kan. 927, 955, 190 P.3d 937 (2008) (stating hard 50 life sentencing scheme "does not expose a defendant to a higher maximum sentence than provided by statute"); see *State v. Hurt*, 278 Kan. 676, 688, 101 P.3d 1249 (2004). Simply put, the crime severity—*i.e.*, the crime seriousness scale—does not increase.

Consequently, we conclude the requirement in K.S.A. 22-3201(c) that a complaint, information, or indictment allege facts sufficient to constitute a crime or specific crime subcategory in the crime seriousness scale (the crime severity) does not require the

State to allege the aggravating factors that are used as a basis to impose a hard 50 life sentence under K.S.A. 21-4635.

## VI. CONSTITUTIONALITY OF HARD 50 SENTENCING SCHEME

Next, in a related argument, Ellmaker contends for the first time on appeal that because a jury does not determine the facts that increase the penalty beyond a reasonable doubt, Kansas' hard 50 sentencing scheme under K.S.A. 21-4635 is unconstitutional under *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2005); *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); and *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999).

This court has previously rejected the same challenge in numerous cases. See, *e.g.*, *State v. Martinez*, 288 Kan. 443, 451, 204 P.3d 601 (2009); *State v. Conley*, 287 Kan. 696, 700-01, 197 P.3d 837 (2008); *Warledo*, 286 Kan. at 954; *State v. Reid*, 286 Kan. 494, Syl. ¶ 23, 186 P.3d 713 (2008); *Williams*, 277 Kan. at 357. Ellmaker fails to present any grounds for reconsidering our prior holdings. His argument fails, and we affirm Ellmaker's hard 50 life sentence.

## VII. CUMULATIVE ERROR

Finally, Ellmaker argues that cumulative error requires reversal of his convictions and remand for a new criminal trial or juvenile adjudication. He contends that even if the errors alleged on appeal do not individually require this court to reverse his convictions, the cumulative impact of the alleged errors denied him a fair trial.

This court has applied the following test to a claim of cumulative trial errors:

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied [the defendant] a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citations omitted.]" *State v. Brown*, 285 Kan. 261, 305-06, 173 P.3d 612 (2007).

The district court's decision to give a deadlocked jury instruction is the only trial error, albeit not reversible error, we have found. "[T]he presence of one trial error is insufficient to accumulate." *State v. Houston*, 289 Kan. 252, Syl. ¶ 14, 213 P.3d 728 (2009).

Because multiple errors have not been found, the cumulative error doctrine is not applicable.

Affirmed.